GEORGE L. KENT, Respondent, *v.* THE QUICKSILVER MINING COMPANY, DANIEL DREW et al., Appellants.

THE SAME RESPONDENT *v.* THE QUICKSILVER MINING COMPANY, DAVID KING, JR., et al., Appellants.

WILLIAM S. HOYT, Appellant, *v.* THE QUICKSILVER MINING COMPANY, Appellant, and GEORGE L. KENT, Respondent, et al.

A private corporation cannot repeal a by-law, so as to impair rights which have been given and become vested by virtue of the by-law; and this although the power is reserved by its charter to alter, amend or repeal its by-laws.

Upon the purchase of shares of the stock of such a corporation, and the issue to the purchaser of the certificate therefor, he acquires a vested right; and any action of the corporation which divides the shares of its stock sold, and in the hands of lawful owners, into two classes, and gives to one class a preference over the other in sharing in the earnings of the corporation, materially and injuriously affects the rights of the owners of the latter class; and, if without their assent or acquiescence, is illegal.

Acts of a corporation which are not *per se* illegal or *malum prohibitum*, but which are *ultra vires*, affecting, however, only the interests of the stockholders, may be made good by the assent of the stockholders, so that strangers to them, dealing in good faith with the corporation, will be protected in a reliance on those acts.

It is not needed that there be an express assent upon the part of the stockholders to work an equitable estoppel upon them. When they neglect to promptly and actively condemn the unauthorized act, and to seek

judicial relief after knowledge of the committal of it, this will be deemed an acquiescence in it; and if innocent third persons have been led thereby to put themselves in a position where harm would come to them if the act were held invalid, the stockholders are estopped from questioning it.

An unconscionable arrangement will not be disturbed where there has been a ratification of it, with knowledge of all its bearings, after time has been had for consideration.

The Q. M. Co., a mining corporation, by its charter (chap. 470, Laws of 1866) had the power to issue certificates of stock representing the value of its property, in such form and subject to such regulations as it might, from time to time, by its by-laws prescribe. A by-law was duly made declaring the whole value of its property and the whole amount of its capital stock, which was divided into equal shares, and directing the issuing of certificates of stock therefor, which was done. Subsequently at an annual meeting of the stockholders, by vote of stockholders holding a majority of the capital stock, it was resolved, and by-laws were adopted to the effect, that holders of the company's stock who should surrender their certificates and pay five dollars on each share, should be entitled to the same number of shares of preferred stock, which should be entitled to interest at seven per cent per annum, to be paid out of the net profits of the company, any surplus of earnings after payment of such interest, to be divided *pro rata* among the holders of preferred and common stock. The preferred stock was at once, after said annual meeting, offered for subscription to all of the stockholders, and a circular informing them thereof was issued and distributed to them. A large number subscribed and paid the sum prescribed, which went into the assets and business of the company. Certificates for the old stock were surrendered, and certificates for the preferred stock were issued to said subscribers; and it, as well as the common stock, was dealt in and sold openly at the stock exchange, the former bringing the highest prices. They were quoted in the daily public prints, and for four years the two kinds of stock were spoken of in annual reports of the directors. During this time there was no action of the company, or of any individual stockholder, to have a judicial declaration that the creation of the preferred stock was unauthorized. In actions subsequently brought by holders of the common stock for that purpose, *held*, that such holders were chargeable with notice of the issuing of the preferred stock; and that, by so acquiescing in the action of the corporation, they had ratified and assented thereto, and the same was binding upon them, at least as against those holders of the preferred stock who had purchased after it had been in the market, and dealt in as a valid and recognized issue; also that, as the prayer for relief was, in effect, that all of the preferred stock should be called in and canceled, and as it was not practicable to adjudge that a portion of the shares of the preferred stock should be called in and canceled, or equalized with the common stock, without all being so treated, there was no cause of action.

Also *held*, that the issue of the preferred stock with the privilege attached could not be considered as an executory contract.

Also *held*, that the transaction could not be considered as a borrowing by the company, but as a preferring of one class of stockholders to another; and that there was no power in the corporate body, or in the majority of the stockholders, to thus provide for the creation of a preferred stock so as to bind the minority of the stockholders not assenting thereto or acquiescing therein.

*A. R. W. Co.* v. *Riche* (7 E. & I. App. [L. R.], 653), distinguished.

Also, *held*, that a holder of common stock had an equitable right to restrain a privileged payment to a preferred stockholder from the profits of the company, and to have the contract therefor declared invalid; but that it was his duty to have been prompt in the application for relief before innocent third persons could be injured.

(Argued April 21, 1879; decided September 16, 1879.)

THESE are appeals from judgments of the General Term of the Supreme Court, in the first judicial department, affirming judgments entered upon decisions of the court on trial at Special Term.

The action first entitled was brought to restrain, and the judgment therein did restrain defendant, The Quicksilver Mining Company, from converting or agreeing to convert the shares of its stock known as common stock into preferred stock, and from issuing any further preferred stock, and the individual defendants from converting any of the common stock into preferred stock. (Reported below, 12 Hun, 53.)

The second action was brought for an accounting by said company, and for a distribution of the net earnings as follows: To pay first to the preferred stockholders seven per cent per annum upon the amount of their stock, the residue to be divided *pro rata* among the holders of the common and preferred stock.

The third action was brought to restrain said company from paying, and the individual defendants, holders of preferred stock, from receiving, any sums as interest or as dividends in excess of dividends paid on the common stock; to restrain said company from issuing any further preferred stock; to have the preferred stock already issued declared

illegal, and for an accounting and distribution of the net. earnings equally among the stockholders. The judgment dismissed plaintiff's complaint, adjudged the preferred stock to be legal and valid, and its holders entitled to the preference it purported to give, and directed the said company to account and to distribute its net earnings accordingly. (The last two cases reported in 17 Hun, 169.)

The material facts found were substantially as follows: The Quicksilver Mining Company is a corporation created by a special act of the Legislature of the State of New York, passed April 10th, 1866 (chap. 470, Laws 1866, p. 1021), "for the purpose of holding and improving lands in California, or elsewhere, and obtaining therefrom minerals and other valuable substances, and disposing of the products of such lands, mines and works."

Section two of the charter is as follows:

"Section 2. The said company shall have power to make such by-laws as they may deem proper, to enable them to carry out the objects of the corporation, and the same to alter, amend, add to, or repeal, at their pleasure, provided that such by-laws shall not be contrary to the constitution of this State, or the provisions of this act, and to adopt a common seal, and the same to alter at pleasure, and to issue certificates of stock, representing the value of their property, in such form, and subject to such regulations, as they may, from time to time, by their by-laws prescribe, and to regulate and prescribe in what manner and form their contracts and obligations shall be executed."

The charter contains no further provision in respect to the capital stock. The company adopted the following by-laws, among others.

"Four. Certificates of stock, amounting to $10,000,000, shall represent the value of the property of the corporation, and the capital stock shall be divided into 100,000 shares of $100 each.

"Five. The said certificate shall be in such form as shall be prescribed by the board of directors.

" Six. All certificates shall be registered on the books of the company when issued. No certificate shall be transferable, except on the books of the company, or of an agent appointed by the board of directors for that purpose. Every share of stock shall entitle the holder thereof to one vote at all meetings of the corporation, and may be voted on by proxy in the usual form.

" Seven. The contracts and obligations of the company shall be made and executed in such manner and form as the directors may determine.

" Eleven. No dividend shall be made except from actual surplus profits, and these profits (except a reasonable reserve fund), shall be divided as often as once in six months. All dividends shall be payable at the office of the company, in New York.

" Fourteen. The directors may, from time to time, on the credit and responsibility of the company, borrow such sums of money as they may deem consistent with the interests of the company, and as a security for the repayment of such loans, they shall have the authority to issue notes of the company, and to pledge or mortgage any shares of stock or other estate, personal or mixed, belonging to the company.

" Sixteen. These by-laws may be altered, amended or repealed, at any regular or special meeting of stockholders, by a vote of a majority in interest of all the stockholders."

The capital stock authorized by the fourth by-law was issued in one certificate to William Bond, president, and George J. Forest, treasurer of the Quicksilver Mining Company of Pennsylvania in payment for mining property purchased of the Pennsylvania company, and for the purpose of being distributed among the holders of the stock of that company, share for share.

At the annual meeting of the stockholders of the company, held pursuant to notice as required by the by-laws; on the fourth Wednesday of February, 1870, the following amended by-laws and resolutions were adopted by a unanimous vote of 75,658 shares:

"By-law IV. Certificates of stock amounting to $10,000,000 shall represent the value of the property of the corporation, and the capital stock shall be divided into 100,000 shares of $100 each. Certificates of stock upon which five dollars ($5) per share shall be paid, shall be distinguished as preferred stock.

"By-law No. XI. The preferred stock shall be entitled to interest at the rate of seven per cent per annum, from the 1st of May, 1870, to be paid annualy out of the net earnings of the company for each year. Should there remain a surplus of earnings after the payment of the said interest upon the preferred stock, then this surplus shall be divided *pro rata* among the holders of preferred and common stock, in proportion to their several interests.

"Resolved, That a preferred stock of the company be issued in shares of $100 each, and that the treasurer be directed to open books at the office of the company in the city of New York, and to receive subscriptions to said preferred stock. Such subscriptions shall be received only from the holders of the common stock of the company on their surrendering to the company common stock, and paying to the treasurer five dollars on each share of stock surrendered.

"The common stock so surrendered shall be canceled before the issue of the preferred stock, share for share.

"Resolved, That the books for subscription to the preferred stock shall be closed by the board of directors whenever the interests of the company, in their opinion, will be promoted by so doing."

Books for subscription were accordingly opened, circulars containing the amended by-laws and resolutions were distributed to the stockholders, and notices were published in the New York daily papers. Owners of common stock to the amount of 42,913 shares subscribed for a corresponding number of shares of preferred stock, surrendered their said shares of common stock, and paid to the company the sum of five dollars on each share so surrendered; and the com-

pany thereupon issued and delivered to them certificates of shares of preferred stock, in which it was stated that such stock was entitled to the preference, specified in said amended by-laws.   Since that time the two forms of certificates have been issued and continue to be issued by the company upon the surrender of like certificates for transfer ; and the entire capital stock of the company, both common and preferred, has been transferred and the certificates thereupon surrendered and new certificates issued corresponding to those surrendered.   Since May, 1870, the stock of the said company has been regularly called at the Stock Exchange in the city of New York, and there openly bought and sold in the usual manner under two designations, viz. : " Quicksilver Common " and " Quicksilver Preferred," and upon such sales the price of " Quicksilver Preferred " has always been in advance of " Quicksilver Common," and reports of such calls, purchases and sales of said stocks have been regularly made by the Stock Exchange and published in the daily papers in the city of New York.   The sum realized from subscriptions to the preferred stock was appropriated by the company to the payment of its current expenses, the interest on its mortgage debt and of judgments, for which the company was liable. At the annual meeting of the stockholders in February, 1871, the report of the president was submitted, stating that the by-laws authorizing the preferred stock were adopted at the last annual meeting by a unanimous vote of 75,658 shares, giving a complete copy of such by-laws, with a detailed statement of the amount received for subscriptions to the preferred stock and the disbursement of the same, and also showing the number of shares of common and of preferred stock.   This report was by resolution approved, and the same with accompanying statement was directed to be published in pamphlet form for the information of the stockholders.   Annual reports were presented and accepted at the annual meeting of the stockholders, held in the month of February in each of the years 1872, 1873, 1874, 1875, 1876 and 1877.   Such reports were printed pursuant to

resolutions adopted at the annual meetings, and were distributed to stockholders and other parties interested.     At the annual meeting of the stockholders, held on the 24th of February, 1874, the following preamble and resolutions were adopted by a vote of 68,274 shares in the affirmative to 2,500 in the negative :

"Whereas, at a meeting of the stockholders, held February 24, 1870, a resolution was adopted giving the privilege of conversion into preferred stock to the holders of the common stock of the company upon the payment of five dollars per share for each share of common stock so converted, and that the option of such conversion was duly closed by the directors on the eighteenth of April following, at which time 42,913 shares of preferred stock had been issued as above provided.

"And, whereas, from the report of the president, submitted to this meeting, it seems desirable that previous to the payment of dividends the same privilege of conversion should be extended to the holders of the 57,087 shares of the common stock now outstanding, it is hereby

"Resolved, That the company will issue its preferred stock to the holders of the common stock of the company, share for share, upon the surrender of such common stock, and the payment, at the time of issue, of five dollars, and interest from February 24, 1870, upon each share of stock so surrendered.

"Resolved, That the common stock so exchanged shall be canceled previous to the issue of preferred stock, share for share.

"Resolved, That the directors be hereby authorized at their option, to close the books of the preferred stock for the purpose of this exchange whenever, in their judgment, the interest of the company will be promoted thereby, giving      days' notice previous thereto."

Previous to the sixteenth day of November, when the action of *Hoyt* v. *The Quicksilver Mining Company* was commenced, no suit or legal proceeding of any kind was

brought by any common stockholder to restrain the issue of said preferred stock, or to have the same declared invalid, or to prevent the carrying out of the contract with the preferred stockholders ; nor previous to the said meeting of stockholders in November, 1874, was any written protest or statement made in reference to the preferred stock, nor previous to that meeting was any serious or public objection to said preferred stock ever made, or any serious or public question as to its validity raised by any stockholder.

*Joshua M. Van Cott*, for the Quicksilver Mining Company, appellant. The contract for a preference is not such an one as equity will execute. (Story's Eq. Jur., § 769 ; Fry on Spec. Perf., §§ 251, 252.) The contract for preference having been one in contravention of law and public policy is illegal. (*Egerton* v. *Earl Brownlow*, 4 H. of L. R., 1, 131, 155, 164, 203 ; Smith on Contracts, Chap. on Illegal Contracts, Metcalf on Contracts, chap. 4 ; Bishop on Contracts, chap. 12; *Farrington* v. *Tennessee*, 5 Otto, 679, 686, 687.) All stock created and contracts made by corporations contrary to the fundamental provisions of their charters are illegal and void. (*People* v. *Utica Ins. Co.*, 15 J. R., 382, 384; *City Bk. Columbus* v. *Bruce*, 17 N. Y., 507; *New H. R. Co.* v. *Mechanics' Bank*, 13 N. Y., 599; *N. H. R. Co.* v. *Schuyler*, 34 N. Y., 30; *H. and N. H. Co.* v. *Croswell*, 5 Hill, 383, 386; *Railway Co.* v. *Allerton*, 18 Wallace, 233; *In re Bangor Co.*, L. R. [20 Eq. Cas.], 59, 65; *Hutton* v. *Scarburrough, Co.*, 4 De Gex, J. & S., 677; *Salem Midlam Co.* v. *Roper*, 6 Pick., 26; *Knowlton* v. *Congress and Imp. Spring Co.*, 57 N. Y., 534; *Riche* v. *Ashbury Co.*, L. R. [7 Eng. and L. App.], 653; *Mutual Life Ins. Co.* v. *McKelway*, 1 Beasley Ch. R. [N. J.], 133; *Crocker* v. *Whitney*, 71 N. Y., 161; Ang. & A. on Corp., § 256; *Johnson* v. *Bush*, 3 Barb. Ch. R., 207; *Talmage* v. *Pell*, 3 Seld., 328; *Leavitt* v. *Palmer*, 3 Comst., 19; *Huntington* v. *Sav. Bk.*, 6 Otto, 388; *Barry* v. *Merch. Exch. Co.*, 1 Sandf. Ch. R., 280, 310, 311; Wordsworth Joint Stock Case, 74, citing *Moss* v.

*Lyers*, L. J. Ch. R., 711, for 1863; *In re Comstock*, 3 Sawyer, 218; *Lemple* v. *Bank Brit. Columbia*, 6 Reporter, 9; *Carpenter* v. *Black Hawk Mining Co.*, 65 N. Y., 43; *Commonwealth* v. *Smith*, 10 Allen, 448; *Richardson* v. *Libby*, 11 id., 65.) The doctrine that presumptions are to be made in favor of acts done "in apparent pursuance of a general authority" is inapplicable to this case. (*Payne* v. *Burnham*, 62 N. Y., 73; *Zabriskie* v. *Cleveland R. Co.* 13 How. [U. S.], 398; *Lowry* v. *Inman*, 46 N. Y., 125.) The contract being illegal, it could not be made valid by a ratification; and in this case no ratification could be presumed. (*Payne* v. *Burnham*, 62 N. Y., 79.)

*William Allen Butler*, for Hoyt et al., appellants. The issue of the "preferred stock" attempted by the Quicksilver Mining Company by the resolution passed at the stockholders meeting in February, 1870, was without authority and illegal. (12 Hun, 53, 59; Laws 1853, chap. 333, p. 705, § 2; *Boynton* v. *Hatch*, 47 N. Y., 225; *Scheneck* v. *Andrews*, 57 id., 133; *People* v. *Troy House Co.*, 44 Barb., 625, 634; *Brick Church* v. *Mayor*, 5 Cow., 540; *McDermott* v. *Board of Met. Police*, 25 Barb., 635; *People* v. *Manhattan Co.*, 9 Wend., 351, 384; *Baptist Church* v. *Brooklyn F. Ins. Co.*, 19 N. Y., 305, 306; Potter on Corp. [1879], § 254; *People* v. *Coms. of Taxes*, 23 N. Y., 192, 219; *Livingston* v. *Lynch*, 4 Johns. Chy., 537, 573, 594, 597, 599; *Hutton* v. *Scarboro Cliff Co.*, 2 D. & Smales, 514; 13 Weekly Reporter, 631; *Vermont and Canada R. R. Co.* v. *Vermont Cent. R. R. Co.*, 34 Vt., 1, 50; *Bank of Attica* v. *Manufacturers' Bank*, 20 N. Y., 301; *Miller* v. *Cook*, L. R. [10 Eq.], 639–646; *Tyler* v. *Yates*, L. R. [11 Eq.], 265; *Plumbe* v. *Carter*, note to *Floyer* v. *Edwards*, Cowp., 116; *Jestons* v. *Brooks*, id., 793; *Dowes* v. *Heaps*, 3 V. & B., 117.) The "preferred stock" could not be upheld as issued in the exercise of the power of the corporation to borrow money. (*Taft* v. *Hartford, Prov. and Fishkill R. R. Co.*, 8 R. I., b. 10; *Williston* v. *Mich. So. and N. Ind. R. R.*, 13 Allen, 400; *Jones* v. *Terre Haute and*

*Alton R. R. Co.*, 57 N. Y., 196; *Evansville R. R. Co.* v.
*City of Evansville*, 15 Md., 395, 415; *McLoughlin* v. *Detroit
R. R. Co.*, 8 Mich., 103; *Haselhurst* v. *Savannah R. R. Co.*,
43 Geo., 53; *Bates* v. *Androscoggin and Kennebeck R. Co.*,
49 Me., 491; *Lockhart* v. *Alstyne*, 31 Mich., 77–79.)   The
assignees of the parties who advanced the $214,565 and
took the illegally issued certificates have no greater or better
title than their assignors, they are simply their successors in
the same interest. (*Mechanics' Bank* v. *N. Y. and N. H. R.
R. Co.*, 13 N. Y., 599; *McCready* v. *Rumsey*, 6 Duer, 574;
*Ketcham* v. *Bank of Commerce*, 19 N. Y., 499, 511; *Hughes*
v. *Vermont Copper Mining Co.*, 72 id., 207–210; 56 id.,
623.)   The attempted issue of the "preferred stock" being
invalid and void the common stockholders are not barred
from asserting its invalidity by any supposed assent, acqui-
escence or lapse of time. (*Livingston* v. *Lynch*, 4 Johns.
Chy., 597; *Ashbury Railway Carriage Co.* v. *Riche*, L. R.
[7 Eng. and I. App.], 653; *Houldworth* v. *Evans*, L. R. [2
H. L.] 249; Lord Hatherly, 687; *Ormsbey* v. *Vermont
Copper Mining Co.*, 56 N. Y., 623; *Eslanger* v. *New Som-
broro Phosphate Co.*, L. R. [3 App.], 1208; *Imperial Bank
Hindostan*, L. R. [6 Eq.] 91; *Salem Milldam Co.* v *Roper*, 6
Pick., 23.)   The judgment in the first suit of *Kent* v. *Quick-
silver Mining Company* is not a bar to the relief sought in
this action, no question being raised as to the right of the
"common stockholders." (Coke Litt., 352 a; *Campbell* v.
*Hall*, 10 N. Y., 575; *Scofield* v. *Churchill*, 72 id., 565–570;
*Castle* v. *Noyes*, 14 id., 329, 335.)   The preference contract
being illegal cannot be enforced at law by holders of the
"preferred stock." (*Knowlton* v. *Congress and Empire
Spring Co.*, 5 N. Y., 518.)   As up to the commencement
of this action no dividend or payment of interest on the
preferred stock had been made no right has been acquired
by any holder of the "preferred" certificate or any assigns
of such holder to any specific part of the corporate property
or earnings. (*Jones* v. *Terre Haute and Richmond R. R.
Co.*, 57 N. Y., 196, 206; *Brown* v. *Collins*, L. R. [12 Eq.],

594; *Hyatt* v. *Allen*, 56 N. Y., 553–557 cases; *Ketcham* v.
*Bank of Commerce*, 19 id., 499; *Allen* v. *Dykers*, 3 Hill,
593; *Horton* v. *Morgan*, 19 N. Y., 170; 46 id., 143; *In re
Magdalen Steam Nav. Co.*, J. R., 690.)

*John K. Porter*, for respondent. The suit of Kent was
maintainable as in the nature of a bill of peace. (Story's
Eq. Jur., § 854; *Prouty* v. *Mich. S. and N. I. R. R. Co.*,
1 Hun, 666; *Williston* v. *Same*, 13 Allen, 400; *Bouton* v.
*City of Brooklyn*, 15 Barb., 392; *Henry* v. *Great Northern
Ry. Co.*, 1 De Gex & Jones, 606.) Under the provisions
of its charter, the Quicksilver Mining Company was invested
with a general authority to create preferred stock. (2 Redf.
on Railways [3d ed.], 598; *Hazelhurst* v. *Savannah R. R.*,
43 Ga., 53; *Prouty* v. *Mich.*, etc., *R. R. Co.*, 1 Hun, 663,
664; *Rutland*, etc., *R. R. Co.* v. *Thrall*, 35 Vt., 545, 546;
*Lockhardt* v. *Van Alstyne*, 31 Mich., 81–84, 85; *Bates* v.
*Androscoggin*, etc., *R. R. Co.*, 49 Me., 491; *Westchester*, etc.,
*R. R. Co.* v. *Jackson*, 77 Penn., 321; *Evansville R. R. Co.*
v. *Evansville*, 15 Md., 395; *Richardson* v. *Vt. and Mass. R.
R. Co.*, 44 Vt., 613; *McLaughlin* v. *Detroit and Mich. R.
R. Co.*, 8 Mich., 100; Brice's Ultra Vires [2d ed.], 59;
*Taylor* v. *Chichester*, etc., *R. R. Co.*, L. R. [2 Exch.], 384;
*Curtis* v. *Leavitt*, 15 N. Y., 66, 67; *In re Patent File Co.*,
L. R. [6 Ch.], 88; 1 Lindley on Partnership, 4; *Riche* v.
*Ashbury Co.*, L. R. [7 Eng. & Irish App.], 653; *Kent* v.
*Quick. Mining Co.*, 12 Hun, 57; *Warner* v. *Mower*, 11 Vt.,
392; 1 Potter's Law Corp., 436; Lindley on Partnership
[3d ed.], 285; *Twin Lick Oil Co.* v. *Marbury*, 1 Otto, 589;
*McLaughlin* v. *Detroit R. Co.*, 8 Mich., 100, 103; *St. John*
v. *Erie R. Co.*, 10 Blatch., 279; Green's Brice's Ultra Vires,
147.) The general authority conferred by the charter to
create preferred stock, and the regularity of this issue created
a presumption of validity upon which subsequent purchasers
had a right to rely, and which in the present position of
parties cannot be questioned. (*Chautauqua Co. Bk.* v.
*Risley*, 19 N. Y., 381; *Wilmarth* v. *Crawford*, 10 Wend.,

344; *Bk. of U. S.* v. *Dandridge*, 12 Wheat., 70; *Nelson* v. *Eaton*, 26 N. Y., 410; *All Saints' Church* v. *Lovett*, 1 Hall, 221; *Monument Nat. Bk.* v. *Globe Works*, 101 Mass., 57; *Eastern Co. R. Co.* v *Hawkes*, 5 Ho. Lords, 373, 381, 382; *Royal Brit. Bk.* v. *Turquand*, 6 Ellis & Blackburn, 332; *Com'rs of Knox Co., Ind.,* v. *Aspinwall*, 21 How. [U. S.], 545; *Miners' Ditch Co.* v. *Zellerback*, 37 Cal., 579; *Holbrook* v. *N. J. Zinc Co.*, 57 N. Y., 621, 622; *Bissell* v. *Mich. So. and N. I. R. R. Co.*, 22 id., 290; *Webb* v. *Herne Bay Com'rs*, L. R. [5 Q. B.], 642; *F. and M. Bk.* v. *B. and Drovers' Bk.*, 16 N. Y., 137; *N. Y. and N. H. R. R. Co.* v. *Schuyler*, 34 id., 70, 73; *Zabriskie* v. *Cleveland, etc., R. R. Co.*, 23 How., 400, 401; *Goulding* v. *Davidson*, 26 N. Y., 622; *Lowell* v. *Daniels*, 2 Gray, 161; *Keen* v. *Coleman*, 30 Penn., 299; *Bodine* v. *Killeen*, 53 N. Y., 98.) The presumption of validity, arising from the general authority to create preferred stock, and the regularity of this issue, is confirmed, and the restraint upon the company, if it existed at all, has been rendered inoperative as to the existing preferred stock by the conduct of the stockholders. (12 Hun, 60; *Hazlehurst* v. *Savannah R. R. Co.*, 43 Ga., 53; *Bissell* v. *Mich. S. etc., R. R. Co.*, 22 N. Y., 269–276–277; *Whitney Arms Co.* v. *Barlow*, 63 id., 68, 69; *Ashbury, etc., Co.* v. *Riche*, L. R. [7 Eng. & I. App.], 680; *De Graff* v. *Amer. Linen Thread Co.*, 21 N. Y., 127; *Bradley* v. *Bullard*, 15 Ill., 417; *Zabriskie* v. *Cleveland, etc., R. R. Co.*, 23 How. [U. S.], 395–398; *Twin Lick Oil Co.* v. *Marbury*, 1 Otto, 592; *Bruce* v. *Davenport*, 3 Keyes, 474; *Cairncross* v. *Lorimer*, 3 Macqueen R., 830; *London Permanent Benefit Build. Soc.*, 17 Wkly. R., 514; affirmed, 21 L. Times [U. S.], 8–10; *Society for Savings* v. *City of New London*, 29 Conn., 174; *Evans* v. *Smallcombe*, L. R. [3 H. L.], 240; *Spackman* v. *Evans*, id., 171–253–255; *Phosphate of Lime Co.* v. *Green*, L. R. [7 C. P.], 43; *Payson* v. *Stoever*, 2 Dillion, 433; 3 H. L., 193–247–256–257; L. R. [7 Eng. & I. App.], 600; L. R. [7 C. P.], 62–63.) The minutes of the company were properly admitted in evidence. (*High-*

*land Turnpike Co.* v. *McKean,* 10 J. R., 154; *Hamilton, etc., Co.* v. *Rice,* 7 Barb., 162; *Abernethy* v. *Society, etc., of Puritans,* 3 Daly, 5; 1 Greenl. on Ev., § 493, p. 115; 2 Phill. on Ev., 249, note, 343; *Commonwealth* v. *Wollper,* 3 Serg. & Rawle, 29; *Grays* v. *Turnpike Co.,* 4 Sand., 578; *Wood* v. *Jefferson Co. Bk.,* 9 Cow., 194–205.) The judgment in *Kent* v. *Quicksilver Mining Company* was properly admitted in evidence. (*Doty* v. *Brown,* 4 N. Y., 74; *Burchard* v. *Dias,* 3 Den., 238; *Castle* v. *Noyes,* 14 N. Y., 331; *Miller* v. *White,* 50 id., 141; *Hastings* v. *Drew,* 4 N. Y. Wkly. Dig., 469.) The intended issue of additional preferred stock was clearly in violation of the contract with the preferred stockholder, and the judgment restraining such issue should be sustained. (*Campbell* v. *London, etc., R. Co.,* 5 Hare, 129; 2 Redf. on Railways [5th ed.], 527, § 237, sub. 2; *Pearson* v. *London and Croydon R. Co.,* 14 Simons, 541; *Kent* v. *Quicksilver Mining Co.,* 12 Hun, 61; *McLaughlin* v. *Detroit R. Co.,* 8 Mich., 103; *Ins. Co.* v. *Connor,* 17 Penn., 136–143; *Westchester, etc., R. Co.* v. *Jackson,* 77 id., 321; *Frazier* v. *Whally,* 2 Hemming & Miller, 10; *Smith* v. *Cook, etc., Ry. Co.,* Irish R. [3 Eq.], 374.)

*John R. Dos Passos,* for Quigley et al., preferred stockholders, respondents. The company was authorized by its charter (Laws 1866, chap. 470) to create preferred stock. (12 Hun, 53, 57, 60.) This right was not impaired by the act of the company in originally fixing the amount of the capital, provided the consent of its stockholders was obtained. (A. & A. on Corps. [10th ed.], § 329; *King* v. *Ashwell,* 12 East, 22; *Rex* v. *Westwood,* 4 B. & C., 806; *R. Co.* v. *Allerton,* 18 Wal., 233; 12 Hun, 57, 59, 61; *Prouty* v. *Mich. So. and N. I. R. R. Co.,* 1 id., 662.) To authorize the creation of preferred stock under the charter, it was not necessary that the power should be given in express words. *Harrison* v. *Mex. R. Co.,* 12 Eng. R. [Moak's Notes], 793; Field on Corps., 136, § 121; Brice on Ultra Vires [2d Eng.

ed.], 365; Redf. on Railways, § 237.)   Unless expressly restrained by its charter, a corporation, with the consent of its stockholders, has the inherent power to issue preferred stock as an incident to the power to borrow money.   (Brice Ultra Vires [2d. ed.], 59, 270, 281; Redf. on Railways, 237; Field on Corps., 136; Green's Brice's Ultra Vires, 147, and note; *Lockhart* v. *Van Alstyne*, 31 Mich., 76; *Hazelhurst* v. *Savannah R. Co.*, 43 Ga., 13; *Tottan et al.* v. *Tison et al.*, 54 id., 139; *Westchester and Phil. R. R. Co.* v. *Jackson*, 7 Legal Gaz., 53; 77 Penn. St. R., 321; *Bates* v. *Androscroggin and Kennebec R. R. Co.*, 49 Me., 491–492; *Rutland, etc. R. R. Co.* v. *Thrall*, 35 Vt., 534; *Davis* v. *Props. of Meeting House, etc.*, 8 Metcl., 321; *Willeston* v. *Mich. So. and N. Ind. R. R. Co.*, 13 Allen, 400; *Prouty* v. *Mich. S. and N. I. R. R. Co.*, 1 Sup. Ct. R., 655 662; *Evansville, etc. R. Co.* v. *City Evansville*, 15 Ind., 395; *Curtis et al.* v. *Leavitt*, 15 N. Y., 9; *Farmers' Loan and Trust Co.* v. *Clowes*, 3 id., 470; *Farmers' Loan and Trust Co.* v. *Curtis*, 7 id., 466; *City B'k of Columbus* v. *Bruce*, 17 id., 507; *Alcott* v. *Tioga R. Co.*, 27 id., 546; *Hope Mut. Life Ins. Co.* v. *Perkins*, 38 id., 404; *Meech* v. *City Buffalo*, 29 id., 198; *Munford American Life Ins. and Trust Co.*, 4 id., 463; *De Rugters* v. *St. Peter's Church*, 3 id., 238; *Re Anglo Danubian Steam Nav. Co.*, L. R. [20 Eq.], 339; Green's Brice's Ultra Vires, note; *McLoughlin* v. *Detroit R. R. Co.*, 8 Mich., 100; *Re London India Rubber Co.*, L. R. [5 Eq.], 519; *Re Bangor, etc. Slab Co.*, L. R. [20 Eq.], 59.)   Even if the act of issuing the preferred stock was *ultra vires*, the company and its stockholders are estopped now from questioning its validity.   (*Coleman* v. *Eastern Counties R. Co.*, 10 Beavan, 1; *Whitney Arms Manuf. Co.* v. *Barlow*, 63 N. Y., 62; Brice's Ultra Vires [2d ed.], 50, 763, § 259; *Parish* v. *Wheeler*, 22 N. Y., 494, 506–507; *Smith* v. *City Albany*, 61 id., 444; *Perkins* v. *Portland R. Co.*, 47 Me., 573; *Banks* v. *Buffalo R. Co.*, 24 N. Y., 269; *Buffat* v. *Troy R. Co.*, 36 Barb., 42; affirmed, 40 N. Y., 168; *Hazelhurst* v. *Savannah, etc. R. Co.*, 43 Ga., 13; *Banks et*

*al.* v. *Matthews,* 19 Albany L. Jour., 132–134; *Phosphate Lime Co.* v. *Green,* 1 Eng. R., 98; L. R., [7 Common Pleas], 43; *Payson* v. *Stoever,* 2 Dillon [U. S. Cir. R.], 427; *Mechanics' B'k* v. *N. Y., etc., R. R. Co.,* 13 N. Y., 599–622, 638; *In re London Permanent Building Co.,* 17 W'kly R., 513; affirmed, 21 L. Times [N. S.], 8; *Bargate* v. *Shortridge,* 5 H. L., 297; Walls' Appeal [78 Penn. R.], 370; *Hull Flax and Cotton Mill Co.* v. *Wellesby,* 30 L. J. [N. S.], part 2– 5; *In re Financial Corp. King's Case,* L. R. [2 Ch.], 714; *Sewell's Case,* L. R. [3 Ch.], 131; 2 Story's Eq., 874; 2 Red. on R., § 220; *Brotherhood's Case,* 31 Beavan, 36; *Weaver* v. *Barden,* 49 N. Y., 286; *McNeil* v. *Tenth Nat. B'k,* 46 id., 325; *Moore* v. *Miller and Metro. Bank,* 55 N. Y., 41; *Bank* v *Lanier,* 11 Wall., 369; *Matthews* v. *Mass. Nat. Bank,* 10 Albany L. J., 198; *Holbrook* v. *New Jersey Zinc Co.,* 57 N. Y., 616; *N. Y. and N. H. R. R. Co.* v. *Schuyler,* 34 id., 30; *Jome* v. *Parkersburg R. Co.,* 59 Md., 36; 17 Amer. R., 548; Angel & Ames on Corp., 243 [10th ed]; *Bissel* v. *Mich. R. Co.,* 22 N. Y., 258; *De Groff* v. *American Linen Thread Co.,* 21 id., 124; *Bradley* v. *Bullard,* 55 Ill., 413; *Carpenter* v. *Black Hawk Mining Co.,* 65 N. Y., 43; *Milnor* v. *N. Y. and N. H. R. R. Co.,* 53 id., 363–365; *Hood* v. *N. Y., etc., R. R.,* 22 Conn., 502; *Converse* v. *N. Y., etc., Tr. Co.,* 33 id., 179; *Tracy* v. *Tallmage,* 14 N. Y., 162; *Moss* v. *Averill,* 10 id., 450; *N. Y. Trust and Loan Co.* v. *Helmer,* 12 Hun, 35; *Firemen's Ins. Co.* v. *Ely,* 2 Cow., 678; *N. Y. Life Ins. and Trust Co.* v. *Beebe,* 3 Seld., 364; *Seneca Co. Bank* v. *Lamb,* 26 Barb., 595; *Barton* v. *Port Jackson Plankroad Co.,* 17 id., 397; *De Witt* v. *Brisbane,* 16 N. Y., 508; *Richie* v. *Ashbury,* 7 Eng. & Irish App., 653; *Bushnell* v. *Chatauqua Co. Nat. Bank,* 10 Hun, 375; *Whitney Arms Co.* v. *Barlow,* 63 N. Y., 62; *Alexander* v. *Brown,* 9 Hun, 641; *Brown Bros.* v. *Torrey,* 42 N. Y. Sup. Ct. R., 1; *Gould* v. *Town of Oneonta,* 3 Hun, 401; *Ogdensburg, etc., R. R. Co.* v. *Vermont, etc., R. R.,* 16 Abb. [N. S.], 249; *Hope Mut. Life Ins. Co.* v. *Taylor,* 2 Robt., 278; *Akin* v. *Blanchard,* 32 Barb., 527; *Mott* v. *U. S. Trust Co.,* 19 id.,

568; *Steam Nav. Co.* v. *Weed,* 17 id., 378; *Fister* v. *La Rue,* 15 id., 323; N. Y. Supreme Ct., 1843; *Moss* v. *Rossie Lead Co.,* 5 Hill, 137; *Moss* v. *McCollough,* 7 Barb., 279; *Farmers and Mechanics' Bank* v. *Champion Trans. Co.,* 18 Vt., 131; *Twin Lick Oil Co.* v. *Marburg,* 1 Otto, 587; *Omaha Hotel Co.* v. *Wade,* 17 Albany L. J., 161; *Chubb* v. *Upton,* U. S. Sup. C. [5 Otto], 665; *Sauger* v. *Upton,* 1 Otto, 56; *R. Co.* v. *Howard,* 7 Wall., 392–412–413; *Alleghany* v. *McClenkson & Co.,* 16 Penn., 81; *Coleman* v. *Columbia Oil Co.,* 51 Penn. St. R., 74; *Chicago Building Society* v. *Crowell,* 65 Ill., 455; *Bradley* v. *Ballard,* 55 id., 117; *West* v. *Madison Co. Agricultural Board,* 82 id., 205; *State Board of Agriculture* v. *Citizens' Street R. Co.,* 17 Amer. R., 702; 47 Ind., 407; Sedgw. Stat. & Const. L., 73 [2d ed.] ; *Argente* v. *City of San Francisco,* 16 Cal., 256; *Miners Dutch Co.* v. *Zellerback,* 37 id., 543; *Nion Water Co.* v. *Murphy's Co.,* 22 id., 620; *Grand Gulf Bank* v. *Archer et al.,* 8 Smedes & Marshall's [Miss.], 151; *Bank of Port Gibson* v. *Nevell,* 6 S. & M., 513; *Thompson* v. *Lambert,* 44 Iowa, 239; *Southern Life Ins. and Trust Co.* v. *Lanier,* 5 Florida, 110; *State of Florida* v. *Florida, etc., R.,* 15 id., 696; *Hall* v. *Union National Fire Ins. Co.,* 32 N. H., 295; *Germantown Farmers' Mutual Ins. Co.* v. *Dhein,* 43 Wis.; *Bank of State of S. C.* v. *Hammond,* 1 Rich. [S. C.], 281; *Savage* v. *Ball,* 17 N. J. Eq., 142.) The preferred stock constitutes a contract between its holders and the company, and the latter had no authority or power to interfere with, vary, modify or depreciate the same by an additional issue of preference shares. (Angel & Ames on Corp. [10th ed.], 209; *Kennebec, etc., R. R. Co.* v. *Kendall,* 31 Maine, 470; *Reeves* v. *Boston Copper Co.,* 15 Pick., 351; *Stratton* v. *Allen,* 16 N. J. Eq., 229; *March* v. *Eastern R. R. Co.,* 43 N. H., 515; *Ins. Co.* v. *Conner,* 17 Penn., 136; *Cooper* v. *Frederick,* 9 Ala., 738; *Stevens* v. *R. and B. R. Co.,* 29 Vt., 545; *Henry* v. *Great Northern R. Co.,* 1 De Gex & Jones, 647; *Westchester and Phila. R. R. Co.* v. *Jackson,* 77 Penn., 321.)

FOLGER, J.   These are suits in equity to perpetually restrain the Quicksilver Mining Company from taking certain action, on the one hand proposed by it with the expressed assent of some only of the stockholders in it; and on the other hand, demanded of it by certain other of the stockholders in it, which demand it and still other stockholders resist.

Whatever the frame of the pleadings in the several actions, and whatever the formal prayer for judgment, the purpose of the litigation in each is to reach a final and binding judgment, whether certain "*preferred stock*," heretofore created by that company, is so far valid as to be recognized in the future business of the company as giving to the holders thereof the peculiar right expressed in the certificate thereof.

What is meant by "*preferred stock*" is well enough known in law and business, without definition or circumlocution here.

All the powers which that company had were given to it by its charter (Laws of 1866, chap. 470, p. 1021); and by the Revised Statutes (vol. 1, pp. 599–600, §§ 1, 2, 3). Thereby it had the usual general powers of a corporation; (see Angell & Ames on Corporations, § 110.) It had also the peculiar power of holding, improving and working mining lands in California and elsewhere, and of disposing of the product thereof.   It had also the power to issue certificates of stock, representing the value of its property, in such form and subject to such regulations as it might from time to time by its by-laws prescribe; and to regulate and prescribe in what manner and form its contracts and obligations should be executed.   It is claimed that it had also incidental and implied powers.   So it had, so far as permitted by the Revised Statutes; which declare that in addition to the powers therein enumerated and to those expressly given in its charter, it should not possess nor exercise any, except such as should be necessary to the exercise of the powers so enumerated and given.   (1 R. S., 600, § 3.)

Plainly a mining corporation, for the exercise of its power of mining in its lands, must have money.   Hence if it has

it not, and cannot otherwise readily get it, it must, as necessary to the use of its corporate rights, have the power to borrow it; and in any way, and upon any obligation or security to be given by it, that is not unlawful. (*Curtis v. Leavitt*, 15 N. Y., 9.) It may borrow it from the stockholders in it, as well as from other parties; and it may determine and agree to borrow from them only. This corporation was in need of money to carry on its authorized business. It did get money, for that purpose and because of that need, from some of the stockholders in it; and in that instance from some of them alone. If the mode by which that money was got was a borrowing, within the sense which the law and common acceptation give to that term, then the transaction so far would have been lawful; and it would have remained to inquire whether the obligation given was a lawful instrument. But it was not a borrowing. The idea of a borrowing is not filled out unless there is in the agreement therefor a promise or understanding that what is borrowed will be repaid or returned; the thing itself or something like it of equal value, with or without compensation for the use of it in the meantime. To borrow is the reciprocal action with to lend; and to lend or to loan, say the dictionaries, is the parting with a thing of value to another for a time fixed, or indefinite yet to have sometime an ending, to be used or enjoyed by that other, the thing itself, or the equivalent of it, to be given back at the time fixed, or when lawfully asked for, with or without compensation for the use as may be agreed upon. In this transaction with some stockholders, that corporation had not the right, nor was it under the liability to ever pay back the five dollars per share furnished by them to it; that was not named in the terms of the obligation given, nor was it contemplated in the negotiation and bargain. The stockholder had not by the scope of his bargain, nor by the terms of the written evidence of it, any right ever to ask for repayment of the money furnished by him. In short, there was not formed thereby the relations of

debtor and creditor. The stockholder parted forever with the money furnished, inasmuch as the charter of the company is perpetual, and the company made a perpetual charge upon its net earnings. Though there was a compensation fixed for the use of the money, and though it was to take the form of a yearly payment, and at a rate the same as the then lawful rate of interest, yet we cannot conceive that the transaction was a loan and borrowing of money, with a compensation for the use of it. If it had been, though the compensation was great for the sum furnished, yet it was not a violation of the usury laws of which the corporation could avail itself (Laws of 1850, chap. 172); and the courts might not overhaul it; save, perhaps, as an unconscionable and extortionate agreement (1 Story Eq. Juris., §§ 246–331); as to which we will speak again before the close. The transaction is not to be looked upon as other than a preference of one class of stockholders to another; as giving to the first class a perpetual inextinguishable prior right to a portion of the earnings of the company before the other class might have anything therefrom. It was none other than the creation of a "preferred stock."

Then there arises the query, whether there was at that time power in the corporation to distinguish between the stockholders in it, to form them into two classes, and to give to one class rights in the corporate property, business and earnings, from which the other was shut out.

We are not prepared to say that, at the first, the corporation might not have lawfully divided the interest in its capital stock into shares arranged in classes, preferring one class to another in the right it should have in the profits of the business. The charter gave power to make such by-laws as it might deem proper, consistent with constitution and law; and to issue certificates of stock representing the value of the property. We know nothing in the constitution or the law that inhibits a corporation from beginning its corporate action by classifying the shares in its capital stock, with peculiar privileges to one share over

another, and thus offering its stock to the public for subscriptions thereto. No rights are got until a subscription is made. Each subscriber would know for what class of stock he put down his name, and what right he got when he thus became a stockholder. There need be no deception or mistake ; there would be no trenching upon rights previously acquired ; no contract, express or implied, would be broken or impaired.

This corporation did otherwise. A by-law was duly made, which declared the whole value of its property and the whole amount of its capital stock, and divided the whole of it into shares equal in amount, and directed the issuing of certificates of stock therefor. It is not to be said that this by-law authorized anything but shares equal in value and in right; or that the taker of one did not own as large an interest in the corporation, its capital, affairs, and profits to come, as any other holder of a share. Certificates of stock were issued under this by-law, that gave no expression of anything different from that. When that by-law was adopted, it was as much the law of the corporation as if its provisions had been a part of the charter. (*Presbyterian Church* v. *City of New York*, 5 Cow., 538.) So it is said in Grant on Corporations, page 80, in a qualified way. Thereby, and by the certificate, as between it and every stockholder, the capital stock of the company was fixed in amount, in the number of shares into which it was divisible, and in the peculiar and relative value of each share. The by-law entered into the compact between the corporation and every taker of a share ; it was in the nature of a contract between them. The holding and owning of a share gave a right which could not be divested without the assent of the holder and owner ; or unless the power so to do had been reserved in some way. (*Mech. Bank* v. *N. Y. and N. H. R. R. Co.*, 13 N. Y., 599–627.) Shares of stock are in the nature of *choses in action*, and give the holder a fixed right in the division of the profits or earnings of a company so long as it exists, and of its effects

when it is dissolved. That right is as inviolable as is any right in property, and can no more be taken away or less-ened, against the will of the owner than can any other right, unless power is reserved in the first instance, when it enters into the constitution of the right; or is properly derived afterwards from a superior law giver. The certifi-cate of stock is the muniment of the shareholder's title, and evidence of his right. It expresses the contract between the corporation and his co-stockholders and himself; and that contract cannot, he being unwilling, be taken away from him or changed as to him without his prior dereliction, or under the conditions above stated. Now it is manifest that any action of a corporation which takes hold of the shares of its capital stock already sold and in the hands of lawful owners, and divides them into two classes — one of which is thereby given prior right to a receipt of a fixed sum from the earnings before the other may have any receipt therefrom, and is given an equal share afterwards with the other in what earnings may remain — destroys the equality of the shares, takes away a right which originally existed in it, and materially varies the effect of the certificate of stock.

It is said that when a corporation can lawfully buy prop-erty, or get money on loan, any known assurance may be exacted and given which does not fall within the prohibi-tion, express or implied, of some statute (*Curtis* v. *Leavitt*, 15 N. Y., 66–67); and that is sought to be applied here. But the prohibition to such action as this is found, not indeed in a statute commonly so called, but in the constitu-tional provision which forbids the impairment of vested rights, save for public purposes and on due compensation. The right which a stockholder gets on the purchase of his share and the issue to him of the certificate therefor is such a vested right.

It is contended that the power so to do is an incidental and implied power, necessary to the use of the other powers of the corporation, and is a legitimate means of raising

money and securing the agreed consideration therefor. We have already conceded that it is legitimate to borrow money, and to secure the repayment of it, with a compensation for the use of it. But that is when it is done in such way as to put the burthen upon every share of stock alike, and to enable every share of stock to be relieved therefrom alike; in such way as to preserve the equality of right and privilege and value of the shares, and maintain intact the contract thereto with the stockholder.

Citations are made to us for the converse of this; but they do not come up — sometimes in their facts, sometimes in their declarations — to the necessity of the proposition. Either it is where the capital is not limited and it is new shares that may be issued with a preference, and where there is express power to borrow on bond and mortgage (2 Redf. on R'ways, chap. 33, sec. 4, § 237; *Harrison* v. *Mex. R. W.*, 12 Eng. Rep., 793); or the amount of the capital has not been reached and such stock is issued therefrom (*Hazelhurst* v. *Savannah R. R.*, 43 Ga., 53; *Tottan* v. *Tison*, 54 id., 139); or there was legislative authority (*Davis* v. *Proprietors*, 8 Metcf., 321; *Rutland R. R. Co.* v. *Thrall*, 35 Vt., 545); or a restriction to authorized capital and there was unanimous consent of the stockholders (*Prouty* v. *M. S. and N. I. R. R.*, 1 Hun, 663; 43 Ga., 53, *supra*); or there was power to redeem, which was a transaction in the nature of a debt (*Westchester, etc., R. R. Co.* v. *Jackson*, 77 Penn. St., 321); or the opinion was *obiter* (*Bates* v. *Androscoggin R. R. Co.*, 49 Maine, 491); or it was the case of a subscription for stock with a condition for interest until the corporation was in operation (*Richardson* v. *Vt. and Mass. R. R. Co.*, 44 Vt., 613); or it was an action on a subscription more favorable to defendant than to other subscribers, and it was held, that defendant could not set up the lack of equality (*Evansville R. R. Co.* v. *Evansville*, 15 Ind., 395); or a solemn determination of this question was not necessary for the disposal of the case (*Williston* v. *M. S. and N. I. R. R. Co.*, 13 Allen, 400); or the issue was authorized by the articles

of association (*In re A'D. St. Nav. and Col. Co.*, 20 L. R. [Eq.], 339); or there was full knowledge on the part of all concerned (*Lockhart* v. *Van Alstyne*, 31 Mich., 81); or the power in the corporate body was conceded, and it was denied that it existed in the directors.; (*McLaughlin* v. *D. and M. R. R.*, 8 id., 100.)

We will not say, for we are not called upon here to say, that never can a corporation rightfully, against the dissent of a portion of its stockholders, make some of the stock preferred ; what we assert is that this case does not present a state of facts in which a power so to do exists. .

There is a power in this charter to alter, amend, add to or repeal, at pleasure, by-laws before made.    It is argued from this that it was in the power of the corporate body, in due form and manner, to alter the by-law which had fixed the amount of the capital stock and the number and relative value of the shares thereof.    The power to make by-laws is to make such as are not inconsistent with the constitution and the law ; and the power to alter has the same limit, so that no alteration could be made which would infringe a right already given and secured by the contract of the corporation.    Nor was the power to alter, to the extent of affecting the contracted relative value of a share, reserved when the share was sold to the stockholder, so as to enter into and form a part of the contract.    An alteration is a *pro tanto* repeal ; but no private corporation can repeal a by-law so as to impair rights which have been given and become vested by virtue of the by-law afterwards repealed. All by-laws must be reasonable and consistent with the general principles of the laws of the land, which are to be determined by the courts, when a case is properly before them. (*The Master*, etc., v. *Green*, 1 Ld. Raym., 113).    A by-law may regulate or modify the constitution of a corporation, but cannot alter it.    (*Rex* v. *Cutbush*, 4 Burr., 2204; *R. W. Co.* v. *Allerton*, 18 Wall., 233.)    The alteration of a by-law is but the making of another upon the same matter.    If the first must be reasonable and in accord with principles of law,

so must that which alters it. If then the power is reserved to alter, amend or repeal, and that reservation enters into a contract, the power reserved is to pass reasonable by-laws, agreeable to law. But a by-law that will disturb a vested right is not such : see *Gray* v. *Portland Bank* (3 Mass., 363; Grant on Corps., 91). And it differs not when the power to make and alter by-laws is expressly given to a majority of the stockholders, and that the obnoxious ordinance is passed in due form.

It needs not that we consider the position that the issue of the preferred stock was an authorized increase of the capital and so legal. It did not profess to be ; nor was it in fact. For each share of preferred stock given out, a share of common stock was taken in ; so that the gross amount of the capital stock was still the same; and so were the number of shares and the nominal value of each share.

We are therefore of the opinion that there was no power in the corporate body, nor in a majority of the stockholders, to provide by by-law for the creation of a preferred stock, so as to bind a minority of the stockholders not assenting thereto.

It is claimed that though there was not that power, as the facts now appear, yet that there was general authority conferred by charter to create such a stock ; and that the regularity of the issue of it created a presumption of validity upon which subsequent purchasers had a right to rely, and which, in the present position of parties, can not be questioned.

It is a rule that the dealings of a corporation, which on their face or according to their apparent import are within its powers, are not to be regarded as illegal and unauthorized, without some evidence tending to show that they are of that character. (*Chautauqua Bank* v. *Risley*, 19 N. Y., 369.) It is another rule, that acts done by a corporation, which presuppose the existence of other acts to make them legally operative, are presumptive proofs of the latter. (*Nelson* v. *Eaton*, 26 N. Y., 410.) And it may be that

where a corporate act is within the general power of the corporation, and its invalidity arises from something not apparent in the grant of power to the body, and which is extrinsic thereto, that one dealing with the corporation in ignorance of that which vitiates will not be affected thereby. We need not rest there, further than such principle is involved in the next topic which we consider. We have not definitely passed upon the question whether this corporation had power in the first instance to divide its stock into preferred and common; and that would need to be settled before disposing of the proposition just noticed.

But there remains a serious question; whether, though there was at the outstart a minority of the stockholders who gave no assent to the corporate act, there has not been such tacit acquiescence and delay in action by that minority as to amount to indefensible *laches* and estoppel upon those who constituted it and their assigns. In our judgment there has; and we find here a safe place on which to rest our decisions of these cases. The findings show that the by-laws empowering the creation and issue of the preferred stock were authorized at a stockholders' meeting regularly called and held and conducted; that the stock was at once offered for subscription to all of the stockholders; that a circular informing thereof was issued by authority and distributed to the stockholders; that though all of them did not avail themselves of the chance to take it, it was not because the chance was not known; a large number of them did subscribe, and paid money for the privilege to the corporation, and that money went into the assets and business of the company; certificates for the preferred stock were thereupon issued, and it, as well as the common stock, was dealt in by the public, sales were made of the two kinds openly at the Stock Exchange, at prices for the one larger than for the other, and quoted in the daily public prints; and from year to year for four years the annual reports of the directors to the stockholders spoke of the two kinds of stock. There was ample knowledge, or means of knowledge, on the part of all stock-

holders, of the action of the corporation in the creation of the two kinds of stock, of the issue of certificates for the preferred stock, of the entry of that stock into the channels of trade, of the public dealings in it at the especial marts for the sale of such property, and of the continued recognition of its existence and validity by the company and the public. It is not to be conceived that the owners of the common stock of this corporation did not have actual knowledge that there had been created a stock having ostensibly greater right and value than their own, and that it had gone into the market and was dealt in by the public interested in the validity of it. For the lapse of four years, however, there was no action of the company, or of an individual stockholder, to have a judicial declaration that the company had exceeded its powers in the creation of the stock, and that it was invalid. We think that these facts, most of which are set forth in the findings in two of the cases, warrant the conclusion of law therein, that the stockholders, by acquiescing in the action of the corporation in making the preferred stock, have ratified and assented thereto, and that the same is binding on them by reason of such assent and ratification.

In the application of the doctrine of *ultra vires*, it is to be borne in mind that it has two phases : one where the public is concerned ; one where the question is between the corporate body and the stockholders in it, or between it and its stockholders, and third parties dealing with it and through it with them. When the public is concerned to restrain a corporation within the limit of the power given to it by its charter, an assent by the stockholders to the use of unauthorized power by the corporate body will be of no avail. When it is a question of the right of a stockholder to restrain the corporate body within its express or incidental powers, the stockholder may in many cases be denied, on the ground of his express assent or his intelligent though tacit consent to the corporate action. If there be a departure from statutory direction, which is to be considered merely a breach of trust to be restrained by a stockholder, it is pertinent to consider

what has been his conduct in regard thereto. A corporation may do acts which affect the public to its harm, inasmuch as they are *per se* illegal or are *malum prohibitum*. Then no assent of stockholders can validate them. It may do acts not thus illegal, though there is want of power to do them, which affect only the interest of the stockholders. They may be made good by the assent of the stockholders, so that strangers to the stockholders dealing in good faith with the corporation will be protected in a reliance upon those acts. The instance put in *Bissell* v. *Mich. So., etc., R. R. Co.* (22 N. Y., 269), is illustrative. A bank has no authority from the State to engage in benevolent enterprizes; and a subscription, though formally made, for a charitable object would be out of its powers; but it would not be otherwise an illegal act; yet if every stockholder did expressly assent to such an application of the corporate funds, though it would still be in one sense *ultra vires*, no wrong would be done, no public interest harmed; and no stockholder could object, or claim that there was an infringement of his rights, and have redress or protection. Such an act, though beyond the power given by the charter, unless expressly prohibited, if confirmed by the stockholders could not be avoided by any of them to the harm of third persons. This arises from the principle that the trust for stockholders is not of a public nature. (Per Willes, J., *Taylor* v. *C. and M. Railway Co.*, 2 L. R. [Exch.,] 390.) These questions have been so much discussed that we need not amplify. (*Whitney Arms Co.* v. *Barlow*, 63 N. Y., 63; *Phosphate, etc., Co.* v. *Green*, L. R. [7 Com. Pl.], 43; *Evans* v. *Smallcombe*, L. R. [3 H. of L.], 249.)

It was not expressly prohibited by the charter, or by any statute, to this corporation to classify the shares of its capital stock, so that one class should have greater right and value than another. It was not *malum in se* so to do, unless it was that a vested right was thereby affected; but that was not a public evil, it was a wrong that affected private persons only, and one which they might assent to. This case is thus, with-

out the principle of *Ashbury Railway Co.* v. *Riche* (7 Eng. & I. App. [L. R.], 653), where the act was expressly prohibited. And where third parties have dealt with the company, relying in good faith upon the existence of corporate authority to do an act, there it is not needed that there be an express assent thereto on the part of stockholders to work an equitable estoppel upon them. Their conduct may have been such, though negative in character, as to be taken for an acquiescence in the act ; and when harm would come to such third parties if the act were held invalid, the stockholders are estopped from questioning it. We suppose acquiescence or tacit assent to mean the neglect to promptly and actively condemn the unauthorized act, and to seek judicial redress, after knowledge of the committal of it, whereby innocent third parties have been led to put themselves in a position from which they cannot be taken without loss. It is the doctrine of equitable estoppel, which applies to members of corporate or associated bodies, as well as to persons acting in a natural capacity : (2 Story Eq. Jur., § 1539.) It is said that there is no question here between the stockholders and third parties ; that it is a question between a minority of the stockholders and a majority of them or the assignees of that majority, and so all stockholders. True, it is a question at this time between the holders of preferred stock and of common stock ; but it is a question of what were the rights which those preferred stockholders took on when they were strangers to the corporation and third parties as between it and the common stockholders in it. They were not stockholders, nor the assignees of stockholders, until as third parties they bought in the market shares of the preferred stock and parted with their money therefor. It was as third parties that they in good faith relied in that action of the corporate body ; and so the question is between them as such and the common stockholders, whether they shall have that right in the corporation which they thought they were to get when they went into the market and bought the right of being a stockholder.

In our view of the matter, a holder of common stock had an equitable right to restrain the privileged payment to a preferred stockholder from the profits of the company, and to have the contract therefor declared invalid. It was his duty to have been prompt in his application to the courts for that relief, before evil could fall upon innocent parties ; and where application to the courts therefor has been delayed by his neglect, and advantages have been gained by the corporate body, assistance should be denied : (*Zabriskie* v. *Cleveland R. R. Co.*, 23 How. [U. S.], 395–398; *Evans* v. *Smallcombe*, 3 H. of L. Cas. [L. R.], 249.) It is said that the common stockholder should have some time in which to seek relief. It is enough to say in answer, that four years at least went by before a holder of common stock asked for the aid of the courts, and then not until a holder of preferred stock asked that aid to restrain proposed corporate action meant to put the common stock upon an equality with his own.

It is true that, as a rule, the assignee of corporate stock takes no greater right than his assignor had to give, and is subject to all the equities which burthen the assignor. It may be that there are some holders of preferred stock who were the first holders thereof, and some who became at an early date owners of it by assignment from the first holders. As to those there is some plausibility in the contention of the common stockholder that they may not, in a legal sense, be injuriously affected by his delay, though the court should order the preferred stock to be called in and canceled. But the prayer for judgment is that all of the preferred stock, in whose hands soever it may be, be so dealt with, or for action equivalent thereto. Many, probably most of the holders of it, have become so after it had been some time in the market, notoriously dealt in as a valid and recognized issue, and at prices greater than that at which the common stock ruled, and greater than would be restored to the holder by any mode of equalization now suggested. The difference in the market price of the two kinds of stock

is here noticed only as being a notorious fact, which could not fail to meet the attention of holders of common stock, and to call upon them for prompt action, if they ever meant to question the validity of the preferred stock ; and as showing that the equalization of the two kinds of stock, upon the basis of making good for the payment of five dollars per share, at which the preference was first subscribed for, would not restore many preferred holders to the position in which they once stood. It is not practicable to adjudge that one or some shares be called in and canceled, or equalized with the common stock, without all are so treated ; and to treat all thus would be to do an injury to some persons who have acted in reliance upon the doings of the company, which have been until now unquestioned by the common stockholders.

Nor can the issue of the preferred stock, with the privilege attached to it, be said to be an executory contract. It is so only in a part of it which it remains for the corporation to do. The first holders of it made their subscriptions and paid the stipulated price ; and so they executed the contract on their part, and the corporation and the common stockholder got the benefit of the execution. The stock has been issued and gone into the channels of trade. The price paid for the privilege held out by the offer of preferred stock went into the funds of the corporation, gave it relief from its needs, and aided in putting it upon a course of prosperity which enhanced the value in market not only of the preferred, but of the common stock. The contract has been executed in its essential parts ; there remains to be done only what is a consequence of it, the result of the purchase of the stock on the one side, and the sale of it on the other. That can scarcely be called a contract yet to be executed, in the application to it of the doctrine of *ultra vires*, whereby one party to it has received, and used for its purposes, the stipulated consideration, and has given to the other a right which he may sell in the market. The vendees cannot be put back to the situation in which they were when they

bought, by any terms proposed by the corporation or the common stockholders. Both parties would not now have the same position as if no contract had been made : (63 N. Y., *supra; De Groff* v. *Am. Linen Thread Co.*, 21 N. Y., 127; 22 id., *supra*.)

We have before made mention of the position that the transaction was unconscionable and extortionate. Looking at it now, it seems to be so. In consideration of five dollars paid, the company undertook to repay seven dollars yearly for all time, if there should be enough earned to do so; which will be an enormous return. It is difficult to enter into the exact condition of things at the date of the transaction, and to estimate the propriety of such a bargain. It may be that the prospect of earnings at all, or enough to fulfill the undertaking, was too remote to be probable ; and that it was a desperate chance that was taken by those who subscribed. There is some reason to suppose so, from the fact that the chance was offered to all stockholders, and that so many did not take it, though it now appears so preposterously advantageous. However that may be, an unconscionable arrangement will not be disturbed when there has been ratification of it with knowledge of all its bearings, after time has been had for consideration. (1 Story Eq. Jur., § 345.)

It is now left to apply our conclusions to the disposition of the three cases before us.

It follows from them that in the suit of *William S. Hoyt* v. *The Quicksilver Mining Company, George L. Kent and others*, the order of the General Term of the Second Department, denying a new trial, should be affirmed ; and that the judgment of the Special Term, dismissing the complaint on the merits and enjoining the plaintiff and all in like category, and declaring the defendant, George L. Kent, and all in like category entitled to receive interest as set forth in the judgment ; and declaring that the plaintiff and all in like category not entitled to receive net earnings, except as therein set forth ; and that the defendant, the company, render an

account as therein set forth ; and that the defendant, Kent, recover his costs ; should be affirmed, with costs : That in the suit of *George L. Kent* v. *The Quicksilver Mining Company, David King, jr., and others*, the order of the General Term of the Second Department, denying a motion for a new trial, should be affirmed ; and that the judgment of the Special Term, so far as it agrees with the preceding statement herein, should be affirmed ; and that the plaintiff, Kent, recover his costs of the defendant company : In the suit of *George L. Kent* v. *The Quicksilver Mining Company, Daniel Drew, and others*, the Special Term gave judgment for the plaintiff, with costs, which was correct. That judgment, in its terms, bound only the parties to it. The General Term of the First Department in rendering judgment, in some phrases thereof, went beyond the scope of that of the Special Term, and by general description declared that persons not parties to the suit, in any way, were estopped if they gave a stockholder's vote for the resolution of February 24, 1870. or if they assented thereto, or in any way ratified it ; but the General Term also affirmed in all things the judgment of the Special Term. We think that the General Term did not mean that persons not parties to the suit should be bound by the judgment ; that the part of its judgment operative upon persons concerned is that which affirms the judgment of the Special Term. The judgment of the General Term should therefore be affirmed.

All concur.

Judgments accordingly.