By the Court.—Freedman, J.
This action is brought by the plaintiff as a stockholder of the Western Union Telegraph Company against the said company, its directors, and the Union Trust Company, to obtain an. adjudication determining that a certain agreement made by the Western Union Telegraph Company with the American Union and the Atlantic and Pacific Telegraph Companies, is void, and for relief not only against the agreement and its execution as being beyond the powers of the telegraph companies, *352 but to the extent of reaching the personal liability of the directors of the Western Union Telegraph Co. The Union Trust Co. was made a party defendant because it had been selected as a trustee for carrying out the agreement. The agreement is dated January 19, 1881, and it provides for the purchase by the Western Union Telegraph Co. of the property, rights, and franchises (except the franchise to be a corporation) of the American Union and the Atlantic and Pacific Telegraph Co.’s at the price of $15,000,000 for the property, &c., of the American Union, and $8,400,000 for the property, &c., of the Atlantic and Pacific Telegraph Co., payable in the capital stock of the Western Union Co. As no stock of that company was on hand to make payment with, it was provided in the agreement that the capital stock of the company should be increased as follows, viz.:
“The Western Union Telegraph Company shall take such proceedings as it may be advised to cause its capital stock to be increased by an addition to its present outstanding stock of $38,926,590, represented by shares of $100 each, and shall issue and deliver the same to the said Union Trust Company for distribution as follows : $15,526,590 to holders of its present shares, the same being to represent its investment of earnings in the purchase, construction and equipment of additional lines, wires and general plant since the first day of July, 1866, and the remaining sum of $23,400,000 for the acquisition of new lines, property and connections in the manner above provided.
“In addition to the new stock above provided to be delivered to Western Union Company shareholders, the amount of $58,855.50, parcel of the present capital stock of said company, owned by it and now in its treasury, shall be distributed in like manner to its shareholders.”
' The complaint, among other things, charges that the *353 corporate action complained of was the result of a fraudulent conspiracy on the part of the individual defendants, but the allegations in that respect were not sustained by the proof at the trial, nor has there been an argument made in their support upon the present appeal. Other matters have in some form or other been alluded to, but the main ground of complaint relates to the alleged invalidity of the agreement in law.
On the hearing of the motion for an injunction during the pendency of the action, it was held, upon the proofs then before the court, that the power to distribute that part of the new stock to be created which is to-be divided among the shareholders of the .Western Union Telegraph Co. in the manner provided by the agreement, does not exist: first, because it is an attempt to turn earnings (to which, at their true value, the shareholders are entitled, subject to the discretion of the directors as to the proportion of the éarnings best to be divided), into capital stock, which the corporation has no power to compel the shareholders to receive; and second, because an exchange of the interest of the shareholders, individually or in the aggregate, in the investments of past earnings for the proposed shares, would be for less than the nominal value of the proposed capital. In arriving "at these conclusions, great stress was laid by the learned Chief Judge upon the fact, that there had been no exercise of the discretion and judgment of the directors as to what is the present value of these investments, and that the parties in interest are entitled to the due exercise of this discretion and to the control of the manner of the use and enjoyment of a dividend in the event that one should be declared.
In most, if not all, of these particulars, the case was materially changed at the trial. It was shown, what did not appear before, that the individual shareholders cannot insist upon a dividend in cash of the earnings *354 which were invested in property, because they approved the investments. Kent v. Quicksilver Co. (78 N. Y. 159). seems to be decisive upon this point. The shareholders who consented to these investments, consented to turn earnings into capital stock. This occurred before the plaintiff acquired title to his stock by purchase.
In the next place, in order to overcome the objection that there was no formal exercise of the discretion and judgment of the directors as to what was the value of the investments at the time of the agreement in question, it was shown that on March 26,1881, a meeting of the board of directors of the Western Union Telegraph Co. was duly held, at which a resolution was unanimously passed fixing the actual value of the property on hand and representing the investments at the time of the making of the agreement, and at the time of the said meeting, exclusive of interest and exclusive of the shares of the capital stock of the Atlantic and Pacific Telegraph Co. then owned by the Western Union Co., to be worth much more than the sum of $15,526,590, and formally declaring a dividend payable in certificates of stock to -the extent of the sum last named.
In the third place, considerable additional evidence was given which, it was claimed, clearly established that the value thus fixed and determined upon was, at the times named, and still is, in point of fact fully equal to the nominal value of the certificates so proposed to be divided. The learned judge who tried the case, came to the conclusion, that the evidence supported the claim, and he found the fact accordingly. Whether the evidence as a whole was sufficient to authorize such a finding, I will not stop at present to consider.
Moreover, the evidence given at the trial fully estab lished the following additional facts, viz.: That on. *355 January 19, 1881, the' property, rights and franchises of the American Union Telegraph Co. agreed to be conveyed to the Western Union Co. were worth, at least to the latter company, the sum of $15,000,000 agreed to be paid therefor, and the property, rights and franchises of the Atlantic and Pacific Telegraph Co. the sum of $8,400,000; that with these acquisitions, and if the property representing investments of past earnings was really worth $15,526,590, exclusive of interest and of the shares of the Atlantic and Pacific Telegraph Co. then owned by the Western Union Co., the property and franchises of the latter company, inclusive of patents, plants, rights and privileges, were and now are worth the sum of $80,000,000 over and above the indebtedness of the company; that at a meeting of shareholders of the Western Union Co. duly convened and held February 5, 1881, the agreement of January, 19, 1881, and a supplementary agreement made by the directors February 3, 1881, were fully ratified and confirmed by a vote representing more than three-fourths of the shares then outstanding, and the proposed increase of stock to $80,000,000 approved; that at a subsequent meeting of shareholders also duly convened and held February 19, 1881, the holders of three hundred and twenty-five thousand nine hundred and thirty-one shares, which number represented more than three-fourths of the shares then outstanding, were present in person or by proxy, and unanimously and formally consented, in a writing signed by them, that the capital stock of the Western Union Co. should be increased to $80,000,000 divided into and represented by eighty thousand shares of $100 each, and that a certificate to this effect was duly filed in the office of the clerk of the city and county of New York, in which city and county the Western Union Co. then had its principal place of business, and also in the office of the secretary of state of the State of New York.
*356 The case made at the trial being as stated, unless the finding can be disturbed that the value on hand representing investments of past earnings, exclusive of interest and of the shares of the capital stock of the Atlantic and Pacific Co. then owned by the Western Union Co. on January 19,1881, was in point of fact fully equal to the nominal aggregate value of the certificates proposed to be divided among the then shareholders of the Western Union Co. the present appeal presents the naked question of law, whether the said agreement of January 19, 1881, is contrary to law.
The examination of this question involves an inquiry into the power of corporations generally, and of telegraph companies in particular, and especially into the power to declare and pay so-called stock dividends.
Now the common law rule on the subject of the powers of corporations generally, undoubtedly is, that the powers of corporations organized under legislative statutes are such, and such only, as those statutes confer ; that a statute confers only such rights as may be fairly implied from what is granted or what is expressed ; that consequently the charter of the corporation, or the enabling statutes, under which it is organized, or both together, constitute the measure of the powers of the company, and that the enumeration of those powers implies the exclusion of all others (Thomas v. Railroad Co., 101 U. S. 71).
This rule of the common law has- been made by statute the rule of this State. Title III., chapter 18, part I of the Revised Statutes, relating to the general powers, privileges and liabilities of corporations, provides that every corporation created under the laws of this State, whether by general laws or by special enactment, and whether the general laws or the special enactment shall or shall not contain a provision that it shall have such power, shall as such have certain *357 powers (viz.: succession, capacity to sue, to use a seal, to hold certain property, to appoint subordinate officers, to make by-laws, &c. &c.), and then comes the following prohibition: “ In addition to the powers enumerated in the first section of this title, and to those expressly given in its charter or in the act under which it is or shall be incorporated, no corporation- shall possess or exercise any corporate powers except such as shall be necessary to the exercise of the powers so enumerated and given.”
On the other hand, it is not every excess of power committed by a corporation that a court of equity can take cognizance of and grant relief against. Whenever application is made to the court for the enforcement of a directory statute, there the judicial discretion exists to enforce or to refuse, according as good faith and circumstances of the case require. There it is necessary that the applicant have a standing in equity, and that his position commend him to the conscience of the court. ■ But where the application discloses that which is positively unlawful, that against which the court will proceed for the sake of the public, and irrespective of the parties, there equity follows the law, and is peremptory. This distinction has full recognition in the courts of this State, and in the case of Kent v. Quicksilver Mining Co. (78 N. Y. 159), was stated as follows: “ In the application of the doctrine of ultra vires it is to be borne in mind that it has two phases—one where the public is concerned ; one where the question is between a corporate body and the stockholders in it, or between it and its stockholders, and third parties dealing with it and through it with them. When the public is concerned to restrain a corporation within the limit of the power given to it by its charter, an assent by the stockholders to the use of unauthorized power by the corporate body will be of no avail. When it is a question of the right of a stock *358 holder to restrain the corporate body within its express or incidental powers, the stockholder may, in many cases, be denied, on the ground of his express assent or his intelligent, though tacit, consent to the corporate action. If there be a departure from statutory direction, which is to be considered merely a breach of trust to be restrained by a stockholder, it is pertinent to consider what has been his conduct in regard thereto. A corporation may do acts which affect the public to its harm, inasmuch as they are per se illegal, or are malum prohibitum. Then no assent of stockholders can validate them. It may do acts, not thus illegal, though there is want of power to do them, which affect only the interest of the stockholders. They may be made good by the assent of the stockholders, so that strangers to the stockholders, dealing in good faith with the corporation, will be protected in a reliance upon those acts.”
It therefore becomes important to consider the standing of the plaintiff in this action. He became a shareholder in the Western Union Co. after the shareholders had approved the investments of the earnings of the company since 1866, and when the transactions complained of were already in fieri. He purchased January 22, 1881, three days after the date of the agreement in question, and the inference is quite strong that, he purchased with notice. Having at least been put upon inquiry, if he had not actual knowledge, the plaintiff waited until the following transactions were completed: The agreement of January 19, provided that the capital stock should be increased, and the purchase made by means of the increase. The statutes governing such matters require in one aspect the written assent of three-fifths, and in another aspect the written assent of three-fourths of the shareholders to the agreement. Within a very few days after January 19, 1881, more than three-fourths of the shareholders gave *359 their assent in writing. Thereupon a supplemental agreement was drawn up providing that, whereas the first agreement had been made dependent upon corporate ratification, and whereas the corporate ratification had not been fully obtained, there should be an immediate delivery of the property and payment of the consideration as far as that could be done. This was done. The properties were delivered, and payment was made, not in the strict terms of the original agreement, because the statutory limit of publication of notice for the increase of the capital stock had not yet expired, but in the obligations of the company redeemable in stock and bearing interest until that time. After that a shareholders’ meeting was held on February 5, at which there was full and formal ratification It was not until after all these occurrences, that the plaintiff commenced this action, viz.: February 12,1881. Under these circumstances it is incumbent upon the plaintiff to establish a violation of a peremptory statute or rule of law, before a transaction can be set aside which has the approval of all the parties in interest except a very small minority, and which is claimed by the large majority to. be for the interest .and advantage of all parties concerned. The question then arises : Has the plaintiff made out such a case ?
The statutes of this State in relation to the incorporation and regulation of telegraph companies are strikingly peculiar and evince a well-defined policy on the part of the legislative power of the State in respect to such companies.
Under chapter 265 of the Laws of 1848, under which the Western Union Telegraph Co. was organized, any number of persons may associate for the purpose of constructing a line of wires of telegraph through this State, or from or to any point within this State, upon complying with certain requirements of the said act. One of these requirements is that such persons shall make *360 and file a certificate which shall specify, among other things, the capital stock, of such association, and the number of shares into which the stock shall be divMed. And section 8 of the same statute further provides that it shall be lawful for any association of persons organized under said act, to provide by their articles of association, for an increase of their capital and of the number of the association.
Chapter 319 of the Laws of 1875, amends the 8th section of the statute of 1848 so as to make it lawful for any telegraph association that has omitted to provide in its articles for an increase of its capital, thereafter, upon complying with certain requirements, among which is the written consent of shareholders holding and owning three-fourths in amount of the then capital stock, and the making and filing of an additional certificate, to provide for an increase of capital stock and the number of shares into which the same shall be divided.
Chapter 98 of the Laws of 1851, authorizes the directors or trustees of any company organized under the act of 1848, at any time, with the written consent of the persons owning two-thirds of the capital stock of such company, to extend their line of telegraph, or to construct branch lines to connect with their main line, or to unite with any other incorporated telegraph company.
Chapter 471 of the Laws of 1853, further amends the act of 1848 by authorizing any number of persons, upon complying with the requirements of the act of 1848, to associate for the purpose of owning or constructing, using and maintaining, a line or lines of electric telegraph, whether wholly within, or partly beyond, the limits of this State ; or for the purpose of owning any interest in any such line or lines of electric telegraph, or any grants therefor. It also enables every telegraph company existing in the State at the time of its passage *361 to obtain the benefit of the statute on filing a certificate of a resolution adopted. by a majority of its board of directors, to organize under the said amendatory act. And finally it authorizes every association entitled to the benefit of the statute, to erect and construct, from time to time, the necessary fixtures upon, over or under any of the public roads, streets and highways, and through, across or under any of the waters within the limits of this State, subject to the restrictions of the act of 1848, and also to erect and construct such fixtures upon, through or over any other land, subject to the right of the owner or owners thereof to full compensation for the same.
Chapter 425 of the Laws of 1862, still further amends the act of 1848. It provides that any company duly incorporated under the last-named act, may construct, own, use and maintain any line or lines of electric telegraph not described in their original certificate of organization, whether wholly within, or wholly or partly beyond the limits of this State, and may join with any other corporation or association in constructing, leasing, owning, using or maintaining such line or lines, and may own and hold any interest in any such line or lines, and may become lessees of any such line or lines, &c., &c.
And finally, chapter 568 of the Laws of 1870, provides as follows,viz.: “In order to perfect and extend the connections of telegraph companies in this State, and to promote their union with the telegraph systems of other States, any telegraph company organized under the laws of this State, may lease, sell, or convey its property, rights, privileges and franchises, or any interest therein, or any part thereof, to any telegraph company organized under, or created by the laws of this or any other State, and may acquire by lease, purchase or conveyance, the property, rights, privileges and franchises, or any interest therein, or any part thereof, of *362 any telegraph company organized under or created by the laws of this or any other State, and make payments therefor in its own stock, money or property, or receive payment therefor in the stock, money or property of the corporation to which the same may be so sold, leased or conveyed, provided, however, that no such purchase, sale, lease or conveyance by any corporation of this State shall be valid until it shall have been ratified and approved by a three-fifths vote of the board of directors or trustees, and also by the consent thereto, in writing or by vote, at a general meeting duly called for the purpose, of three-fifths in interest of the stockholders in such company present or represented by proxy at such meeting.”
The statute last referred to seems to be the culmination of a series of statutory enactments commencing with the introduction of the electric telegraph into this country, and gradually and uniformly expanding into the great freedom given by this statute. The legislation upon this subject evinces, from beginning to end, as was well said by one of the learned counsel for the respondents, a deliberately expanding legislative policy on the part of the State of New York, grounded apparently on the suggestion that so important is the immediate transmission of intelligence, so essential to that immediate transmission is it, that the means by which the transmission is to be made, should be one, that it was worth while for the legislature of this State to afford its sanction and encouragement for the unifying of the means for the transmission of intelligence that thought may go by a single process to the end of the earth if need be.
A legislative will so clearly expressed cannot be disregarded by the' courts, and the argument that such legislation tends to the creation of monopolies and injuriously affects the rights and the property of the minority of shareholders, cannot have any weight with *363 them so long as no constitutional provision has been violated thereby. However well founded, therefore, the claim may be, when considered from other than purely legal standpoints, that the general principle underlying the right government of every incorporated body is, that its members contract with each other separately to submit to the will of the majority in all matters concerning the fulfillment of the objects for which they are incorporated, but in no others; that to this end only can the contract hold; that there is in truth and in fact no identity of directorial and proprietary interests; and that directors should have only such powers as the shareholders may choose to confer, and the majority of shareholders only such as were umanimously conferred,—the courts are bound to ignore it when confronted with an unequivocal exercise of legislative power to the contrary, which is not open to a constitutional objection. All they can do is to see that existing statutes are neither evaded nor exceeded, but fully and fairly complied with; and this duty they will always be found ready and willing to discharge on every proper occasion. In the case at bar no constitutional objection has been raised, and the law of this State in force at the time and under which the Western Union Co. was organized, and which therefore entered into the original contract between the shareholders, expressly reserved to the legislature the power to enact subsequent changes.
The power of the Western Union Co. to create and issue, under the provisions of chapter 568 of the Laws of 1870, to the American Union and Atlantic and Pacific- Companies, stock in payment for their lines, cannot therefore be well disputed. But that does not touch the question whether the agreement of January 19, 1881, as a whole, and when all the objects and purposes to be accomplished by it are considered, is not- in other essential particulars in excess of the authority con *364 ferred by the statute, nor the question concerning the legality or illegality of the proposed division of shares among the shareholders of the Western Union Co.
In respect to the last question a new difficulty is presented by the absence from the case of the articles of association of the Western Union Co. They were not putin evidence. The court therefore cannot know that they do or do not provide for an increase of capital, nor determine whether chapter 319 of the Laws of 1875 is applicable, because that statute in terms applies only to a company that has omitted to provide in its articles for a subsequent increase of capital. If they do so provide, the court has not been informed wha,t the provision is, and hence cannot determine that it has been complied with, or what bearing it has upon the proposed division under consideration.
Assuming, however, for the present, that the Western Union Co., either under its articles of association or the act of 1875, has general power to increase its capital stock upon the written consent of shareholders holding and owning a certain proportion of stock, and that such consent was given and that all necessary formalities were duly observed, the power could only be exercised according to law. Ordinarily, the law requires that additional stock to be issued by a corporation shall be paid for. This power of disposition the directors are to use in trust. They are trustees and are bound to use the power not only as directed specifically by statute, but under. the general obligation of trustees to eestui que trusts. The duty of the trustees is to dispose of the shares in such a manner that value shall be returned for them to the corporation for its business purposes. Such would be the intent of any statute conferring in general terms the power to increase the capital to an amount in dollars, and such is, as was pointed out by the learned Chief Judge in de *365 termining the motion for an injunction, the implication contained in the act of 1875.
The terms of the agreement of January 19,1881, do not provide or contemplate, nor was provision made in any other way, that the distribution of the new shares among the company’s own shareholders should be made upon equivalent value being returned or promised to be returned by the shareholders, nor, indeed, upon any new value to the company. The agreement is sought to be upheld upon the theory that the shares to be distributed represent the company’s investments of earnings in the purchase, construction, and equipment of additional lines, wires, and general plant since July 1, 1866, and that, as these earnings are or were due to or should have been divided among the shareholders, an acceptance of stock that represents them will be a release by the shareholders of the earnings, and is the same in effect as if there had been a severance of the earnings from the other property of the corporation and a delivery to the shareholders, and a return to the company in the Shape of capital. This theory would, upon the facts of this case, be open to no objection, so long as the scheme involved in it has the requisite sanction of a certain proportion of shareholders, if there were no statutory obstacle to it. But in its advocacy the respondents are confronted with the following statute of this State, viz.: “It shall not be lawful for the directors or managers of any incorporated company in this State to make dividends, excepting from the surplus profits arising from the business of such corporation ; and it shall ngt be lawful for the directors of any such company to dividé, withdraw, or in any way pay to the stockholders, or any of them, any part of the capital stock of such company, or to reduce the said capital stock, without the consent of the legislature, &c., &c.” (2 Rev. St. 5 ed. p. 599, § 2; 7 ed. p. 1530, §2.)
*366 This statute is part of a title (title IV. of ch. 18 of part 1 of the Rev. Stat.) containing special provisions relating to corporations, and the conduct of the directors, officers and agents thereof, except library and religious societies, and certain moneyed corporations made expressly subject to another title,—applying to corporations of every description except those expressly excepted (Bowen v. Lease, 5 Hill, 221). Title IV. includes telegraph companies. Were it otherwise, these companies would not be under the control of any of the restraints of the legislature held essential to the public welfare in the case of all other joint stock corporations organized for business purposes.
What then is the particular force and effect to be given to the statute last referred to in the case at bar %
It seems too clear for argument that in the face of that statute, the issue of -the stock to the shareholders of the Western Union Co. cannot be upheld as a dividend from surplus profits, because the profits were no longer on hand. They were converted into other property. Even if such other property remained, and still is, of equal value, it nevertheless took the place of the profits. It became capital. Unless otherwise provided by the charter or by-laws of a corporation, the profits and surplus funds of a corporation, whenever they have accrued, are, until separated from the capital by the declaration of a dividend, a part of the stock itself, and will pass with the stock under this name in a transfer' or bequest (Iron Co. v. Commonwealth, 55 Penn. 451; Brundage v. Brundage, 1 T. & C. 90; Phelps v. Bank 26 Conn. 269).
If such other property deteriorated in value, the further objection would be that to that extent vanished earnings are sought to be replaced by paying out capital.
So in the case of a dividend from profits on hand and ready to be distributed as such. Whatever may be *367 the nature of the dividend, each shareholder’s part of it'is his individually, and he has full control of it and cannot be compelled to reinvest it in the capital stock.
It clearly was not the intention of the parties to the agreement of January 19, 1881, that such a dividend should be declared. The dissenting minority, if any, was to have no choice. No shareholder was to have any option to reinvest or not. The shareholders collectively were not even in a position under the rule laid down in Kent v. Quicksilver Co. (78 N. Y. 159), to insist upon a dividend based upon surplus profits on hand, because none were on hand. Whatever profits there had been, had been reinvested with the approval of the shareholders. When the shareholders did this, they assented to turn profits into capital stock.
The question then arises, whether the proposed distribution of stock among them, is or is not a division, withdrawal or payment of capital stock within the prohibition of the statute. Preliminary to that, it is well to consider: What is the true meaning of the words “ capital stock” as they appear in the statute ?
These words, like all words, are used sometimes, loosely and inaccurately. In Burr v. Wilcox, 22 N. Y. 551, Selden, J., says: “The word ‘stock’ has various significations, but, as applied to joint stock associations or corporations, it means the property and franchises of the company. It is sometimes used te designate the certificate or scrip issued to the stockholders, but this is an inappropriate use of the word. The scrip is not the stock.”
In view of this language, the learned judge who tried the case felt constrained to hold that the agreement provided only for a distribution of certificates and not a distribution of the property of the corporation, and that the distribution of certificates did not, upon the facts found, amount to a division, withdrawal or *368 payment of capital stock within the meaning of the statute. In this I think he erred.
The definition given by Selden, J., is not an exhaustive one. It constitutes part of his reasoning to demonstrate that under another statute, an original subscriber for stock to whom stock has ■ been al • lotted, may be held liable as a share or stockholder to creditors for a debt contracted by the corporation before the certificate was issued to him and his name entered in the index book. In many other cases which were cited by the respondents, similar language was used in the discussion of similar or analogous questions. But none of these cases is in point.
In its most comprehensive sense the capital stock of a corporation includes the property, corporeal and incorporeal, and all the rights and franchises of the corporation. A corporation may have a capital or capital stock before it confers shares in it upon persons, and in such case the capital or capital stock at that point, as pointed out by the learned Chief Judge on determining the motion for the injunction, is the legal faculty and practical ability to dispose of shares of it to individuals in a proper manner for corporate purposes. The capacity which a corporation has within its charter, or under a statute under which it has been organized, of receiving subscriptions and payment for stock, and then issuing it to the individuals who subscribe and pay, is, as was said by Comstock, J., in People v. Commissioners of Taxes and Assessments (23 N. Y. 220), itself a species of valuable right. So, unless otherwise provided by the charter or by-laws of a corporation, the profits and surplus funds which accrue in the course of the business of the corporation, are, until separated from the capital by the declaration of a dividend in cash, a part of the capital stock.
The capital stock, whatever it may be from the start, *369 is usually divided into a certain number of parts or shares, which are disposed of to individuals. Such parts or shares are incapable of manual delivery. But they constitute and are divisions which are recognized, both by law and the commercial community, though all that a shareholder can exhibit of his share consists of a certificate describing it.
The statutes in relation to the incorporation and regulation of telegraph companies, in common with the statutes applicable to other joint-stock corporations and associations, require that every company shall file a certificate specifying, among other things, the capital stock of the company and the number of shares into which it is divided, and that in case of an increase of capital an additional certificate shall be filed, specifying the increased capital stock and the number of shares into which it is divided, &c. These statutory provisions clearly refer to the divisions of stock, which in case of a transfer, are represented by the certificates issued to the stockholders.
It may be conceded, therefore, that a certificate of stock is not a part of the tangible capital of a corporation, but only the muniment of title to part of it and the representative of such part, and that the capital in its tangible shape is owned by the corporation, and that consequently the certificates are not liable for the debts of the corporation, but the capital stock is. Nevertheless, it is equally true that the certificates of stock which a corporation may issue, and which represent the number of shares into which its capital has been divided, represent actual divisions of the capital stock, as much as partition deeds represent actual divisions of land. They clearly represent undivided interests, and are transferable, and, although they do not in "all respects partake of the character of negotiable paper, they pass from hand to hand with assignment and power indorsed in blank. It has been settled by repeated de *370 cisions that, as between the parties, the delivery of a certificate, with such indorsement, passes the entire title, legal and equitable, in and to the shares represented by it (McNeil v. Tenth National Bank, 46 N. Y. 325 ; Leitch v. Wells, 48 Id. 585 ; Grymes v. Hone, 49 Id. 17 ; Johnson v. Underhill, 52 Id. 203 ; Driscoll v. West, Bradley & Carey Manufacturing Co., 59 Id. 96; Cushman v. Thayer Manufacturing Jewelry Co., 76 Id. 365). A stock certificate, issued by a corporation having power so to issue, it was held in Holbrook v. New Jersy Zinc Co. (57 N. Y. 616), is a continuing affirmation of the ownership of the specified amount of stock by the person designated therein, or his assignee, until it is withdrawn in some manner recognized by law, and a purchaser in good faith has a right to rely thereon, and to claim the benefit of an estoppel in his favor as against the corporation. The only method of delivery of shares in the capital stock of a corporation, known to law or commerce, is by a certificate showing that the holder is the owner of so many shares of the stock. Every such owner is entitled to vote according to the number of shares so held, and entitled to a corresponding share in the profits, and, on a formal dissolution, to a corresponding share of the actual property of the corporation. How then can it be held that a division or distribution of a certain number of certificates by a corporation entitling those who receive them to the benefits named, is neither a division nor a withdrawal or payment of capital stock, but only a distribution of paper of no particular consequence ? If such were the law, very little difference would exist for practical purposes between an issue of certificates by the corporation itself, and the issue of certificates by agents in fraud of the corporation.
The conclusion is, therefore, irresistible, that without the consent of the legislature, even a re-division of capital stock, after it has been once fixed and divided into *371 a certain number of shares, and public notice to this effect has been given, is of itself a division prohibited by the statute. But, as I assumed throughout the discussion so far had, that the Western Union Telegraph Co. in some way or other has legislative authority to increase its capital stock, and consequently to re-divide it, that kind of division cannot be accepted as a ground of complaint. On the other hand, it seems to be equally clear, from what has already been said, that in that case, after such increase and re-divison was made, the $15,526,590 of stock, constituted part of the capital stock of the Western Union Co., in the treasury of the company, and as such could have been sold in the market, on account of, and for the benefit of the company. They therefore represented and constituted property, and not mere paper. Consequently, when the Western Union Co. attempted to distribute that part of its capital stock among its own shareholders, without any new consideration, the attempt involved a division, withdrawal and payment of part of the capital stock without the consent of the legislature, within the prohibition of the statute.
There is nothing in the particular statute under consideration, nor in the preamble, taken as a whole, which was attached to it when it was originally passed in 1825, or in the revisers’ notes at the time of the revision of the statutes, which calls for a different construction. Upon and by the revision of the statutes the statute in question, originally entitled “ An Act to prevent fraudulent Bankruptcies by Incorporated Companies, to facilitate proceedings against them, and for other purposes,” was incorporated into and became an integral part of the general body of law enacted for the government and control of corporations.
Allusion having been made on the argument to the increase of the stock of the New York Central R R Co., it is proper to point out that in that case the consent of *372 the legislature was obtained. After an issue of interest certificates, representing expended earnings, it was proposed that the stock of the company should be increased eighty per cent., and that the new stock should be exchanged for the outstanding interest certificates. On application the legislature passed a special act authorizing it to be done, and limiting the use to which the new stock could be put (Laws 1869, ch. 918). On the other hand, when, in order to escape taxation, it was claimed that the shareholders to whom the so-called interest certificates had been issued, acquired no rights whatever by virtue of them beyond what they had before, except the right to accruing dividends, and it appeared that the said certificates had been issued pursuant to a resolution reciting that the railroad company had “ hitherto expended of its earnings for the purpose of constructing and equipping its road, and in the purchase of real estate and other properties with a view to the increase of its traffic, moneys equal to eighty per cent, of its capital,” and reciting further that the shareholders were “ entitled to evidence of such expenditure and to reimbursement of the same at some convenient future period,” and that the railroad company resolved to give them, and did give them, the so-called interest certificates in proportion to the amount of stock held by them respectively, which certificates were made payable ratably with the other like certificates, at the pleasure of the company, out of its future earnings, with dividends thereon at the same rates and times as dividends should be paid upon the capital stock of the company, &c., it was held by the United States supreme court, no questioii having been raised as to the legality of their issue, that the certificates possessed all the qualities of stock, except that they conferred no power to vote, and that their division was a dividend of capital stock, and taxable as such under the U. S. Internal Revenue Act (Bailey v. Railroad Co., 22 Wall. 604).
*373 In the Schuyler fraud cases, which ran through our courts for so many years, and. which, it is true, are distinguishable from the case at bar by reason of the fact that in them the over-issue of shares was based upon no value and was wholly fraudulent, it was argued and at one time (4 Duer, 480) even held that the effect of the over-issue was to increase the number of shares, but not the actual capital, and that the spurious certificates were to be made good by a reduction in the actual value of the shares that were genuine. But in reviewing this argument the court of appeals said: “ Viewing the question as one of abstract power, nothing appears to be wanting to a complete demonstration that additional shares could not be created. There is, under the charter, no more capacity to increase the nominal capital by multiplying the shares to an indefinite extent, than to increase the real capital by an actual subscription indefinitely beyond the specified limit” (Mechanics’ Bank v. N. Y. & N. H. R. R. Co., 13 N. Y. 617).
It seems to me that if I were to multiply quotations any further, it would be a waste of time and labor. From what has already been said, it sufficiently appears that whatever value beyond par the stock of a corporation may have by reason of the existence of a large surplus fund or otherwise, attaches to the stock and forms part of the principal; that a stock dividend is no part of the income, but a division, withdrawal and payment of capital stock, and that consequently where a statute exists, as it does in this State, which prohibits not only all dividends excepting such as may be declared from surplus profits on hand, but also a division, withdrawal or payment of part of the capital stock without the consent of the legislature, no dividend payable in stock can be lawfully declared without such consent, even if based on the estimated value of prop *374 erfcy acquired with earnings which should have been divided in cash.
Neither can the said issue of stock to the shareholders of the Western Union Co. be justified on the theory that under the circumstances of the case the board of directors, or three-fourths of the shareholders, or both together, deemed it necessary to make it. Assuming that the company at the time had in its possession property of sufficient value in excess of its authorized capital, it needed, in point of fact, no increase of its capital stock to hold and enjoy such property. So, however true it may be, that it was advantageous to the Western Union Co. to buy the property, rights and franchises of the American Union and Atlantic and Pacific Telegraph Companies, it is equally certain that the purchases could have been made and paid for by an issue of undiluted stock. In no sense that the law can recognize, was there any necessity for the Western Union Co. to first dilute its stock. A necessity entitled to recognition and respect as such, must arise in the course of the exercise of powers expressly conferred, for it is expressly provided in this State that in addition to the powers enumerated in the first section of title III., chapter 18 of part I. of the Revised Statutes, and to those expressly given in its charter, or in the act under which it is or shall be incorporated, no corporation shall possess or exercise any corporate powers, except such as shall be necessary to the exercise of the powers so enumerated and given. Moreover, in the case at bar, the claim of necessity, if upheld, would nullify a prohibitory statute.
Nor can the said issue of stock be upheld on the theory that if there was any defect in the articles of association of the Western Union Co. and a want of power under the acts in relation to telegraph companies, such defect and want were cured in consequence of the proceedings of the meeting of shareholders had *375 under section 20 of chapter 40 of the Laws of 1848, entitled “An Act to authorize the formation of corporations for manufacturing, mining, mechanical and chemical purposes.” Under that act, it is true, any corporation or company named therein or coming under it, may increase its capital stock, by complying with the provisions of the act, to any amount which may be deemed sufficient and proper for the purposes of the corporation. But at the same time, any stock issued to that end must be paid for, and the new value received therefor turned into the corporation. As I have, throughout the discussion of this case, assumed that the Western Union Co., either under its charter or the act of 1875, has the power to increase its capital stock in this manner to any desired extent, the permission contained in chapter 40 of the Laws of 1848 adds nothing to the strength of the position which without it has been freely conceded to the company. It certainly does not permit an issue of stock without new value being returned therefor to the company, and consequently it cannot and does not render inoperative the prohibition of the other statute that no dividend shall be declared except from surplus profits, and that no division, &c. of capital stock shall be made without the consent of the legislature.
Prom the foregoing it will be seen that notwithstanding the most liberal interpretation of the facts, and the most liberal construction of the statutes in relation to the incorporation and regulation of telegraph companies, and the many assumptions made in favor of the Western Union Co., and the most rigid restriction of the standing of the plaintiff in court, enough is left of plaintiff’s case to call for the interposition of the court on grounds affecting public interests. Even if the assumption be continued that the property representing the investments of past earnings was really worth $15,526,590, and that in view of that fact, no *376 valid objection to the agreement will lie under chapter 568 of the Laws of 1870, and that in other respects the agreement as a whole is not in essential particulars in excess of the authority conferred by said chapter,—as to which matters I express no opinion and which it becomes unnecessary to determine,—yet the construction to be given to the statute forbidding the declaration of dividends except from surplus profits, and prohibiting the division, &c., of capital without the consent of the legislature, being as stated, and no such consent having been found to exist, the plaintiff has demonstrated that the proposed gratuitous division of $15,526,590 of stock among the shareholders of the Western Union Co., is wholly illegal. No action on the part of the directors or the shareholders, or both combined, could overcome this .difficulty, and as the illegality complained of entered into and permeated the agreement of January 19, 1881, inasmuch as by its terms the capital stock of the Western Union Co. was to be first diluted to the extent of the proposed gratuitous issue, and payment for' the property, rights and franchises of the vendor companies to be made in the stock thus depreciated, the agreement itself cannot be sustained.
The action was properly brought by the plaintiff as a shareholder in the Western Union Telegraph Co. on behalf of himself and all other shareholders of that company similarly situated, and though in the matters complained of he may represent only a comparatively insignificant minority, he has, nevertheless, a sufficient interest and standing to make it the duty of the court, for reasons affecting public interests, to entertain his complaint, and upon the proofs given in support thereof to grant appropriate relief. The dismissal of the complaint, therefore, constituted error. As the case stood the plaintiff was at least entitled to an adjudication declaring the illegality of the agreement of January 19, 1881, and enjoining the distribution of the *377 $15,536,590 of stock. How much further relief should have been granted, if any, especially in view of the far-reaching provisions of the statute that has been violated, it is not necessary to express an opinion upon. That is a question which may be best left to be determined on a new trial. Of course, the fact that at the time of the commencement of the action the agreement had been partially executed, and that since the erroneous dismissal of the complaint it may have been wholly executed, so far as lay in the power of the directors, and the majority of the shareholders of the Western Union Co., cannot affect the legal question involved, though it may have an important bearing upon the nature of the relief to be granted.
The judgment should be reversed and a new trial ordered with costs, to the appellant to abide the event.
Russell, J., concurred.
Arnoux, J.
The facts are sufficiently set forth in the opinion of Judge Freedman.
Upon the trial of this cause the testimony was taken with especial reference to the proceedings instituted on behalf of the Western Union Telegraph Company to obviate the criticisms of the special term on deciding the motion for an injunction, and to the value of the property acquired by said company under the contract set forth in the complaint.
The court below found that the formalities required by law to enable said company to enter into said contract had been complied with, and that there was a sufficient consideration for the issue of stock in payment of the property acquired from the other companies.
In these conclusions we concur.
The legislature has placed transactions of the character of the purchase and sale herein, that can legally be made, in the discretion of the board of directors or *378 trustees, expressed by a three-fifths majority, ratified by three-fifths of the stockholders. Their conclusion is final where matters of j udgment only are concerned Therefore, when the element of fraud charged in the Williams complaint was eliminated from the case, the court was barred by the action of the directors and stockholders ; or rather, the adequacy of the consideration became irrelevant. It was a matter solely within the determination of the contracting parties. Under the law in a proper case, a two-fifths minority is wholly and absolutely at the mercy of the three-fifths majority. That is better for the community than to invest the courts with power to redress every fancied or even real grievance arising from errors of judgment, for no court, however exalted, can claim infallibility, and stockholders appealing from the action of their own chosen representatives to the courts might find the remedy worse than the disease.. There must be an ultimate repository of power and of determination in matters of opinion; and, as a general rule, those having the largest interest are the best qualified to judge of the value of their property and the desirability of a purchase and sale. The law giving the majority this power was enacted long before plaintiff became a stockholder in the said corporation, and he bought his stock with actual or implied knowledge that he thus put himself in the power of his representatives and associates. Having so done, he has no legal right or cause to complain of their action, so far as their discretion is concerned, that is, in the consideration to be paid or received.
But the plaintiffs do not rest their cases imply upon the question of value. They insist that the transaction was illegal, whether the price paid and the property received was of sufficient value or not. They contend that the said corporation had no power to increase its capital in the manner or for the purposes contemplated in said contract.
*379 By some inadvertence the charter of the Western Union Telegraph Company was not put in evidence, and therefore we cannot determine whether the issue of stock was legally made, for the law permitting the increase in the manner in which it was attempted to be done in this case applies only to corporations whose charters are silent on the subject.
The general principle is that all stock created by corporations contrary to the fundamental provisions of their charters is illegal and void (N. Y. and N. H. R. R. v. Schuyler, 34 N. Y. 39, 40), and consequently the burden of proving this rested upon defendents.
But assuming that this was regular, and dismissing from our consideration all preliminary and subordinate questions, we pass to the vital question in the case. Was the transaction embraced in the said contract legal or illegal ? and for a proper consideration of this question there are two distinct matters to be separately considered.
1st. The stock dividend.
2d. The purchase of the Atlantic and Pacific and American Union.
1st. Was the agreement to issue stock as a dividend to represent the accretions to the capital of the Western Union Telegraph Company legal %
That stock dividends can be legally declared, has been determined in several important cases. Pierce, in his Treatise on the Law of Railroads (2d ed. p. 123),—a work cited with approbation by the counsel for the defendants and by the court below,—lays down the law in the following language: “ Dividends of stock have been issued where there were net earnings properly applicable for the purposes of a dividend in cash, and it was deemed expedient to retain the amount in order to make permanent improvements or pay debts. They can only be made where there is a power to increase the capital stock to the extent of such dividends.”
*380 These propositions have not been authoritatively determined in this State, but in Howell v. Chicago and N. W. R. R. Co. (51 Barb. 378), where a stockholder invoked the aid of our courts to enjoin a foreign corporation from making a stock dividend, which application was denied for want of jurisdiction, Ingraham, J., speaking of stock dividends as objectionable, says : “Under ordinary circumstances, where a company has earned a dividend, and they desire at the same time ta retain the moneys so earned for the purposes of the company, either in making improvements on the road, or for the payment of its debts, it would be no violation of law "to retain such moneys, and in lieu thereof, to issue to the stockholders a corresponding amount of stock.”
In Ehle v. Chittenango Bk., 24 N. Y. 548, the court of appeals unanimously held that there was no authority in the board of directors to declare that a dividend of the cash profits should be paid in depreciated bank notes. In Scott v. Central R. R. and Banking Co. of Georgia (52 Bart. 45, 67), Mullin, J., following the Ehle case, held that a dividend, when declared, was a debt, and, although earned in Confederate money, could be recovered in United States money.
These cases confirm the principle stated in Pierce, above cited, for if declaring a dividend creates a debt, a corporation has no power to create such a debt without having the cash in hand to pay it. Otherwise actions on such debts might be brought, the property of the company levied upon and sold, the capital become impaired, and the trustees or directors liable under the statute for the deficiency.
There are then these pre-requisites to the legal issuance of a stock dividend : 1. There must be net earnings. . 2. They must be properly applicable to a dividend. 3. They must be in cash. 4. It must be expe *381 dient to retain the cash for corporate purposes. 5. There must be the power to make such increase.
Now conceding that there had been net earnings that had been converted into capital, and that the law permitted the increase of stock, this, under the law as laid down by Pierce, afforded no authority to the board of Directors of the Western Union Telegraph Company to issue the stock in question. They did have the power to sell any surplus property belonging to the corporation, and when such sale was made, to distribute the cash proceeds among its stockholders. But the transaction attempted was very different from this, and the temptation to play fast and loose with the stockholders, to put their earnings into stock at one time to the prejudice of those holders who depend upon their income, and to declare a stock dividend at another time, when the directors or their friends have sufficient control, is too great for many men to resist or to be overlooked and not prevented by the courts.
There is another evil that the courts must recognize. It is not only the watering of stocks, so called, but the increase of capital by withholding dividends from the' stockholders, to build up the corporation beyond its original purpose, so that, from insignificant beginnings, such corporations increase to gigantic proportions, wielding enormous influence for evil in the hands of unprincipled men. The statutes against limitations and perpetuities demonstrate our State’s hostility to any such accumulations, and it is equally contrary to public policy to have such overgrown and despotic corporations in our midst. The opposition to such corporations is extending throughou t the land, and is concreting into an anti-monopoly league.
' We are, therefore, led to the conclusion that it was not lawful for the directors of the Western Union Telegraph Company to declare a stock dividend to represent accumulated earnings of the company.
*382 The fact that such dividends have been made, proves nothing until it is shown that they were made under the statutes that govern this case. The most notable example, that of the New York Central Railroad, was expressly authorized by law,—a quasi recognition that it would not have been lawful without such legislation ; and others were made in other States, in respect to whose laws we have not been advised. Even if we hold this to be the common law and give them the benefit of that presumption, it does not appear that such corporation, at the time of making such dividend, did not have the cash in hand out of which such dividend might have been paid.
Following the precedent of the N. Y. Central Railroad, a change was made by defendants from an actual stock dividend to certificates of indebtedness redeemable in stock. This, however, makes no difference. If the issue of stock is unlawful, it is equally unlawful to issue certificates convertible into stock.
So far then as the increase of the capital stock to represent accumulated earnings invested in the property of the Western Union Telegraph Company is concerned,, this transaction was illegal.
2d. The next question is, whether the purchase of the property of the Atlantic and Pacific Telegraph Company and of the American Union Telegraph Company was legal.
Corporations organized under the laws of this State have no power to sell their franchise or capital unless authorized by statute (Troy & B. R. R. v. Boston, H. T. & W. Ry., 86 N. Y. 109). This doctrine is not confined to this State. It is a principle of the common law. WTiere a franchise is intended, in a large measure, to be exercised for the public good, the due performance of these functions being the consideration of the public grant, to transfer to others the rights and powers conferred by the charter, and to relieve the grantees of the- *383 burden which it imposes, is against public policy and therefore void (Thomas v. Railroad Company, 101 U. S. 83).
The statute under which the authority for this part of the transaction is claimed to have been conferred upon the Western Union Telegraph Company, was passed in 1870 (Laws 1870, ch. 568) and enacted that “in order to perfect and extend the connections of telegraph companies in this State, and promote their union with the telegraph systems of other States, any telegraph company organized under the laws of this State” might “sell, lease or convey,” or might “acquire by lease, purchase or conveyance, the property, rights, privileges and franchises, or any interest therein, or any part thereof, of any other telegraph company,”'and that they might receive or make payment therefor in the stock of the corporation vendor with the approval of three-fifths of its directors and stockholders. This approval, we here assume, has been obtained.
Is this transaction embraced within this statute % If it is then the Western Union Telegraph Company cannot legally be prevented from'Tmying up any and every telegraph line in the country.
Publicists and jurists agree that the welfare of a commonwealth is best promoted by competition in business, and that laws in restraint of trade must be strictly construed. The common mind accords with this, as is evidenced by many familiar proverbs. It is-part of the public policy of the State which the courts take judicial knowledge of and enforce. Competition affords a stimulus that is absent when there is a monopoly. It is not necessary to multiply examples, but one germain to this subject may be mentioned. The English press complain that since the British government has included the telegraph within its postal service, there has not been an important invention in *384 telegraphy in Great Britain, and that, hereafter, they must look to the United States for improvements and developments therein. We cannot suppose that the legislature ever intended to put the community in the power of one corporation in a matter which has become of such vital importance to every interest as the telegraph has. It would require the very clearest and most positive expression of such intention for the courts to hold that the legislature intended to permit any corporation to overcome all opposition or competition, especially where it enters into all the affairs of our modem life, as the counsel for the plaintiff so eloquently described of the telegraph in his oral argument.
We can say, with the court of appeals, in repeated decisions in the town bond cases, that such legislation is contrary to public policy, and that the letter of a law that would confer such privileges of purchase as defendants’ counsel here claim, must yield to the spirit of the law that would protect the people against any such subjugation. But it is not necessary to go to- any such extremes, for no one can find in the letter of the law any unlimited power of purchase, or any right to purchase competing lines'for the sole purpose of ending competition. How, although it is contended by defendants that the Western Union Telegraph Company has, by this purchase, acquired additional offices for the transaction of business, and has made valuable combinations of certain patents, these were incidental, and not the inducement for the contract. The testimany clearly establishes that the “ foundation of all that consolidation” was the suppression of competition, and that the object of the contract was consolidation.
The law of 1870 does not give unlimited power to purchase. The authority to purchase is subject to the beginning of the sentence, which is a-sort of preamble to what follows. The words “in order to perfect and extend the connections of telegraph companies in this *385 State, and promote their union with the telegraph systems of other States, are words of limitation, just as. “in order to pay my debts I authorize my executors to sell my real estate,” would be. If there were no debts the executors under that authority could not sell the real estate.
The purposes contemplated by the act are twofold: 1. To perfect and extend the connections of telegraph companies in this State. 2. To promote their union with the telegraph systems of other States. This clearly does not contemplate the establishment of a gigantic monopoly, nor the destruction or absorption of all rivals. As all the companies concerned in this contract are domestic corporations, we have nothing to do with the telegraph systems of other States. The authority to purchase and sell telegraph properties and franchises of corporations organized under the laws of this State, is limited to those cases where it is done in order to perfect and extend the connections of telegraph companies in this State. There is not the slightest pretense in the evidence, that the contracting parties had any such idea in mind. It certainly did not enter into the contract.
It is now incumbent upon us to scrutinize more closely this contract, and ascertain what it is. In the sale, the franchises that gave corporate existence to' the vendors, are excepted. The able counsel who superintended the contract, comprehended that the law did not permit such sale, according to the authorities heretofore cited. It is likewise true, that what the law' forbids one corporation to sell, it equally forbids another to purchase. If, therefore, it shall appear that this contract, notwithstanding the exception, does, if consummated, convey to the purchaser, the excepted franchises, it will effect an illegal act. And this it does. All their vendible property the corporations selling, dispose of to the Western Union Telegraph *386 Company, and it is an integral part of the scheme, that the stockholders of the vendors shall surrender their stock in exchange for Western Union stock. When this agreement is consummated, the vendor corporations will cease to exist. The defendant corporation will own the property and franchises of the vendors. Their corporate existence will be merged in it. When the Western Union Telegraph Company shall have thus become the owner of the property and stock of the vendors, what remains to them? Nothing. In all practical and legal purposes, they have ceased to exist if this transaction can be upheld. And this result was anticipated. The directors of said defendant, who were personally made parties to the action and examined as witnesses on the trial of this cause, characterized the transaction as an amalgamation or a consolidation of the companies. Such was their intention in making this agreement, and that intention was the fundamental idea of the agreement, in the execution whereof,. another express provision of the statutes of this State was violated. Not one dollar, or the representative of one dollar of all the purchase price, was paid, or to be paid, directly to the vendors. It was all to be paid directly by the Western Union Telegraph Company, to the stockholders of the vendors. Of course, in legal effect, this was the same as if it had been paid directly to the vendors, and by them distributed to their stockholders. The law requires payment to be made to the corporation, and it must hold that stock which is thus paid as the representative of its capital, for it becomes its capital. If it can divide this stock among its stockholders, then it can divide its entire capital among its stockholders. An important part of the argument was devoted to the practical application of this principle to another branch of this case, and it was conceded by the distinguished counsel for the defendants, that this could not be done. If the American Union Telegraph *387 Company can divide the purchase price among its stockholders, then the Western Union Telegraph Company cannot, for the law is equally imperative upon it. That is to say, the law forbids it to contract to do with the stockholders of the American Union Telegraph Company, in consummation of a contract with that company, what that company itself could not directly do.
We find then that, in the purposes contemplated, the methods pursued and the essential scheme of this agreement, the law is violated.
Nor is it possible to uphold it in part and reject it in part. It is evident the stock dividend would not have been declared except in furtherance of the scheme for the consolidation of the other companies with the Western Union Telegraph Company. The purchase price would not have been agreed to except on the basis of a capitalization of $80,000,000. The different provisions of this contract are so intimately connected that if the court should enforce it in part, it would make a bargain that never had had the assent of the contracting parties.
The counsel for defendant, in very earnest and weighty words, urged this court to consider the consequences of their decision. The results that may follow a decision may properly be taken into consideration in determining whether that decision is just. Often an absurd conclusion exposes a false premise. But when a court has arrived at the conclusion that a certain act is illegal, and then is deterred from so deciding from fear of the consequences, then it pusillanimously abdicates its functions of administering justice. With the results in such a case we have nothing whatever to do.
Another matter strongly insisted upon by the distinguished counsel is, that the status of the plaintiff does not entitle them to the consideration of the court. The sale of property carries with it all the rights of the *388 vendors therein (McKee v. Judd, 12 N. Y. 622; Waldron v. Willard, 17 N. Y. 466 ; McBride v. Farmers’ Bank, 26 N. Y. 450); and this rule is true of the transfer of stock certificates (N. Y. & N. H. R. R. v. Schuyler, 34 N. Y. 30, 80; McNeil v. Tenth N. Bank, 46 Id. 325; Isham v. Buckingham, 49 Id. 216, 222; Cushman v. Thayer Manuf. Co., 76 Id. 365, 371). Consequently the plaintiff, in these actions, among other rights ac- ■ quired by their purchase, could make the same objections that their vendors could have made, if they had continued owners ; and as it is not contended that their vendors had estopped themselves from objecting to this transaction by assenting to the instrument in question (the burden of proving which assent lay upon the defendants), the objection that plaintiffs had bought their stock after the promulgation of this contract, is no legal bar to the maintenance of these actions. Conceding, then, that the plaintiffs’ conduct and motives are subject to the just criticism of defendants’ counsel, for the purpose of this decision, they have their rights and they cannot be affected by any such consideration.
The counsel also ask the court to refuse to interfere, on the ground that, if the transaction were ultra vires, it has been so overwhelmingly ratified by the stockholders as to make their consent virtually unanimous. If the transaction were simply ultra vires, this consideration would prevail; but that is not the fact, for the court of appeals say, in Whitney Arms Co. v. Barlow, (63 N. Y. 62, 68, citing Earl of Shrewsbury v. North Staffordshire, L. R. 12, 1 Eq. 593; Taylor v. Chichester & M. R. Co., L. R. 2 Ex. 356; Bissell v. Mich. S. R. R., 22 N. Y. 258), when acts of corporations are “spoken of as ultra vires, it is not intended that they are unlawful or even such as the corporation cannot perform.” And in affirming that case, in Atlantic State Bank v. Savery (82 N. Y. 291, 307), they say “ the transaction was not forbidden. It was not improper in itself.”
*389 This transaction is not embraced in the class denominated ultra vires. If it were it would be governed by thé case of Kent v. Quicksilver Co. (78 N. Y. 159, 185), where the court say, “In the application of the doctrine of ultra vires, it is to be borne in mind that it has two phases—one where the public is concerned. . . ,o When the public is concerned to restrain a corporation within the limits of the power given to it by its charter, an assent by the stockholders to the use of unauthorized power by the corporate body will.be of no avail.” The judgment appealed from must be reversed and a new trial ordered with costs to the appellants to abide the event.