# Cases

# FIFTH DEPARTMENT,

# GENERAL TERM,

## March, 1887.

HENRY MARTIN, as President of the Manufacturers and Traders' Bank, Respondent, v. THE NIAGARA FALLS PAPER MANUFACTURING COMPANY and THOMAS WELCH, as Receiver of the Property of said Company, Appellants, Impleaded, etc.

*Manufacturing corporation—power of, to give mortgages to secure past debts—to secure future advances — power of the president to borrow money and give the company's paper — power of the stockholders to provide that the company shall be bound by paper so issued by the president — their power to ratify his unauthorized acts — when an abstract of the contents of books will be stricken out because of a failure of the party offering it to produce the books themselves.*

This action was brought in November, 1884, by the plaintiff, a banking association organized under the laws of the State of New York, to foreclose a mortgage, dated November 18, 1882, which purported to have been executed by the defendant company, which was incorporated under the general manufacturing act of 1848, as a collateral and continuing security for the payment of all promissory notes or bills of exchange which then had been, or should be thereafter, made, drawn, indorsed or accepted by said company and discounted by said bank, and all sums of money which should at any time be due and owing by said company to said bank, upon any account whatever, to the amount of $60,000. Upon an appeal from a judgment declaring the mortgage to be a valid and subsisting security for the payment of notes to the amount of $60,000, the defendants contended that the mortgage was void because the company had no power to give a mortgage to secure the payment of debts to be contracted in the future.

*Held*, that the claim was properly overruled as it appeared that the notes in suit were the outcome of successive renewals of a debt of over $60,000 which existed at the time when the mortgage was executed.

*It seems*, that the mortgage could be enforced as a security for any notes given by the company, in the course of its business, for debts contracted subsequent to the execution of the mortgage.

*Lord* v. *The Yonkers Fuel Gas Company* (99 N. Y., 547) followed.

*It seems*, that the company has power to give a mortgage to secure future advances, and that if such mortgage were *ultra vires*, no one but the State could take advantage of the defect of power.

*Jones* v. *Guaranty and Indemnity Company* (11 Otto, 632); *The Union National Bank* v. *Matthews* (8 id., 621) followed, and *Carpenter* v. *Black Hawk Gold Mining Company* (65 N. Y., 43) criticised.

The notes were signed in the name of the company by L. C. Woodruff, its president, payable to the order of himself and indorsed by him. The defendants claimed that during all the time of the transactions, evidenced by these notes, Woodruff was the debtor of the company and not its creditor, and that the notes were made and discounted for his accommodation, and that these facts were known to the plaintiff. After the execution of the mortgage, and in December, 1883, the company, by its president, entered into a contract with the plaintiff adjusting the amount due to the plaintiff on certain specified notes at $80,409.17, which amount the plaintiff agreed to lend the company for at least thirty days. The contract also recognized the authority of Woodruff, as president, to bind the company in future transactions, and expressly stipulated that when the name of the company should be used by him as president, as the maker of any promissory note, or the drawer of any draft or bill of exchange, it should be held and conclusively deemed to be for the benefit of the company and in the transaction of its business and binding upon said company. This contract was entered into in pursuance of a resolution adopted by the entire board of trustees of the company, which then consisted of but two members, Woodruff and his daughter, Mrs. Winslow, who were also the sole stockholders.

*Held*, that the authority of Woodruff to borrow money for the use of the company, and to give its paper therefor, might be inferred from the evidence, which showed that, for a period sufficiently long to establish a settled course of business, he was allowed, without interference, to conduct the entire business of the company.

*Kraft* v. *Freeman Publishing Company* (87 N. Y., 628); *Martin* v. *Webb* (110 U. S., 7), followed.

That the contract of December, 1883, which was founded upon a new and valuable consideration, expressly recognized his authority and ratified his giving of notes.

That the burden of showing that the notes were accommodation notes, and that the bank had notice of this fact, rested on the defendants.

That an objection that when the notes in suit and the agreement were made the company was incapable of acting, as it had but two trustees, was not maintainable as the previous assent of all the stockholders was as effective, as a

ratification of the unauthorized act of the president, as a subsequent ratification thereof would have been, and that this would have cured the defect is well settled.

*Kent* v. *Quicksilver Mining Company* (78 N. Y., 159); *Sheldon Hat Blocking Company* v. *Eickemeyer Hat Blocking Company* (90 id., 607) followed.

A by-law of the company required the notes and mortgage to be signed by the secretary.

*Held,* that as it had never been followed, and as it did not prohibit the president from signing, or provide that the lack of the signature of the secretary should render the instrument void, the signature of the secretary was not essential to the validity of the note.

Upon the trial a witness, called by the defendants, stated that he had examined certain books of the company, and also stated the result of this examination as to the state of the accounts. Having stated, in his cross-examination, that the books were then in the court-house, and the defendants' counsel having admitted that he could produce them, but declined to do so, the plaintiff moved that the evidence given from the abstract of the books be struck out on the ground that the books were not produced from which such abstract could be verified.

*Held,* that the court did not err in granting the motion.

APPEAL from a judgment entered upon the decision of the court, rendered at the Erie Circuit, on a trial by the court without a jury.

*George Wadsworth,* for Welch, receiver, appellant.

*Lucius N. Bangs,* for manufacturing company, appellant.

*Sherman S. Rogers,* for the respondent.

SMITH, P. J. :

The plaintiff is a banking association organized under the laws of the State of New York, doing business at the city of Buffalo. The company, defendant, was organized under the general manufacturing law of said State in the year 1856, or thereabouts, doing business at Niagara Falls. The action is brought to foreclose a real estate mortgage purporting to have been executed by said company, dated the 18th of November, 1882, as a collateral and continuing security for the payment of all promissory notes or bills of exchange which then had been or should be thereafter made, drawn, indorsed or accepted by said company and discounted by said bank, and all sums of money which should at any time be due and owing by said company to said bank upon any account whatever, to the amount of $60,000. In November, 1884, certain promissory

notes, amounting in the aggregate to over $80,000, which purported to have been made by the company and were discounted by the bank, having become due and not having been paid, this action was brought, and the defendants, who now appeal, appeared and answered. The trial court adjudged that certain of said promissory notes, amounting to the sum of $67,000, were the valid notes of said company, and that the mortgage is a valid and subsisting security for the payment of said notes to the amount of $60,000, with interest thereon from the 20th of January, 1884, and judgment of foreclosure was ordered accordingly. From that judgment this appeal is taken.

In behalf of the appellants it is contended that the mortgage is void because the company had no power to make it. The original act under which the company was organized provided that a corporation formed under it should not mortgage its property or give any lien thereon. (Laws 1848, chap. 40, § 2.) Subsequently that provision was modified so as to permit the mortgaging of the real or personal property of the corporation to secure the payment of any debt " heretofore contracted or which may be contracted by it in the business for which it was incorporated, by mortgaging all or any part of the real or personal estate of such corportion ; and every mortgage so made shall be as valid, to all intents and purposes, as if executed by an individual owning such real or personal estate, provided that the written assent of the stockholders owning at least two-thirds of the capital stock of such corporation shall first be filed " as specified in the act. (Laws 1864, chap. 517, as amended by Laws 1871, chap. 481.)

Those statutes, the appellants contend, do not authorize a mortgage to secure the payment of debts to be contracted in the future, and consequently the mortgage in suit cannot be resorted to as a security for the payment of the promissory notes above referred to, which were made after the mortgage was executed. There are some adjudications bearing more or less directly upon the point. In *Carpenter* v. *Black Hawk Gold Mining Company* (65 N. Y., 43) Commissioner EARL, in considering the statutes above referred to, said : " A mortgage upon real estate is allowed only to secure the payment of debts. It cannot be made to raise money merely to carry on the operations of the company." But each, of his

associates declined, in terms, to express an opinion on that point. (P. 53.) In the case of *Greenpoint Sugar Co.* v. *Whitin* (69 N. Y., 328), Ch. J. Church, in delivering an opinion in which a majority of the court seem to have concurred, said that the purpose of the statute as amended was in the interest of stockholders only, it being designed to protect them from improvident or corrupt acts of the officers of the company; that the act of mortgaging is not to be deemed illegal or improper, *per se*, but the principal must assent in writing (pp. 333, 334.); and see *Coman* v *Lakey* (80 N. Y., 345; opinion of Church, Ch. J., p. 349). In *Crocker* v. *Whitney* (71 N Y., 161), cited by the appellants' counsel as giving construction to an analogous statute, it was held that under the national bank act of 1864 a national bank is prohibited from taking a mortgage upon real estate, except for debts contracted prior to the giving of the mortgage, and that a mortgage given to secure future indebtedness is void. The eighth section of that act authorized banks formed under it to loan money on "personal security," and the twenty-eighth section permitted them to take and hold real estate mortgaged to it in good faith, by way of security for debts "previously contracted." But the Supreme Court of the United States held, in the *Union National Bank* v. *Matthews*, that a security of that nature is not void, but may be enforced by the bank (19 Alb. L. J., 132; S. C., 8 Otto, 621); and in *Jones* v. *Guaranty and Indemnity Company*, the same court construed the statutes now under consideration, and held that a corporation formed under them has power to give a mortgage for future advances. (11 Otto, 632.) It also held that if the mortgage be *ultra vires*, no one but the State can take advantage of the defect of power. The reasoning of Judge Swayne in that case is very cogent and convincing. The case of *Carpenter* (*supra*) was brought to the attention of the court in that case, it having been cited in the briefs of counsel (L. C. P. Co.'s Ed, U. S. Sup. Ct, Rep., Book 25, p. 1033), and it must be regarded as having been disapproved so far as it is in conflict with the decision. We might properly dispose of this point upon the authority of that case, since there is no adjudication of this court or of the Court of Appeals in conflict with it. But it is needless to do so. In the later case of *Lord* v. *The Yonkers Fuel Gas Company* (99 N. Y., 547) a trust mort-

gage was given by a corporation formed under the act of 1848, to secure the payment of its negotiable bonds to be thereafter issued, and the proceeds of the bonds, when issued, were used in paying debts of the company contracted in carrying on its business after the execution of the mortgage. It was held that the mortgage was valid, the court being of the opinion that the statute was complied with if the bonds were negotiated only for the purpose of securing or paying debts contracted before the negotiation; the security for the creditors then for the first time comes into being, and is as effectual as if the mortgage was executed at the same time with the delivery of the bonds. Mr. Justice RAPALLO, in delivering the opinion of the court, referred to each of the cases above cited, in which the acts of 1848 and 1864 were considered. That case seems to be analogous to this, so far as the mortgage under consideration is sought to be enforced as a security for notes given by the paper company in the course of its business for debts contracted subsequently to the execution of the mortgage, and if it were necessary, we think the decision of the trial court upon this point might be upheld on the authority of that case. But it appears that the notes in suit are the outcome of successive renewals of a debt of over $60,000, which existed at the time when the mortgage was executed, so that the mortgage does not exceed even the limit suggested in the *Carpenter* case. We think the contention under consideration was properly overruled by the trial court.

It is also contended that the debt which the mortgage was intended to secure was not a debt contracted by the corporation in the business for which it was incorporated, and that for that reason the mortgage is not authorized by the statute and is void. The several notes in suit were signed in the name of the company by L. C. Woodruff, its president, payable to the order of himself and indorsed by him. Upon their face, therefore, they represented a debt owing by the company to Woodruff, primarily, which, by his indorsement and the discount, was transferred to the bank. But the contention of the appellants is understood to be that the evidence shows that during all the time of the transactions evidenced by the notes, Woodruff was the debtor of the company and not its creditor, and that the notes were made and discounted for his accommodation and benefit, and that those facts were known to

the plaintiff. The facts bearing upon that branch of the case, as shown by the findings or uncontradicted evidence, are substantially as follows: The paper company was organized, as has been said, in or about the year 1856. Woodruff was one of its original organizers. At all times after 1858, he was the president of the company and its principal stockholder, and had the general management of its affairs, and he and his daughter, Mrs. Winslow, owned all the stock when the mortgage in question was given, except one share standing in the name of H. G. Cordley, to qualify him to act as a trustee, but which really belonged to Woodruff. For twenty-five years and more no new election of officers had been made by the stockholders; and it is apparent from the testimony, and especially that given by Woodruff himself, that during all that time the affairs of the company were, practically, under his exclusive control, and were managed by him as if they were a part of his personal and private concerns. The paper company received and paid out large sums of money in its business, but it kept no bank account in its own name, except for a short time, when it had a small account with a bank in the village of Niagara Falls. Woodruff lived in Buffalo, and opened an account there with the plaintiff, which was continued for many years in his individual name, and subsequently to October, 1883, in the name of L. C. Woodruff & Co. During all that time he was engaged in business of his own as well as in the management of that of the paper company, and all the money deposited or drawn out by him, whether in the name and for the benefit of the company, or of himself individually, was entered in one and the same account at the bank, without anything to designate to whom it belonged or for whose benefit it was used, as between him and the company. A large portion of the earnings of the company from its business, and of the proceeds of the paper of the company, discounted by the plaintiff, was deposited there, and carried into such account. For some time Woodruff gave the bank monthly statements, showing how much money the company would need during the month, and, as he testified, he very frequently drew from the account at the bank to pay the expenses of the mill. A similar account was kept in the name of L. C. Woodruff, at a bank in the city of New York, into which a portion of the

earnings of the company entered, and from which moneys were drawn, from time to time, to meet its expenses. It also appears that at the mill an account was kept with Woodruff, individually, in which he was charged with all the earnings of the mill taken by him, and credited with what he paid out for the mill, and there is evidence on the part of the defendants tending to show that the mill made money, and that every year, except one or two, Woodruff received more from the mill than he paid out for it. The president of the bank was told by Woodruff that the paper company was making money, but he testified that he did not know the state of the accounts between Woodruff and the company, or that any of the notes of the company were accommodation paper, or were not made in the course of its business.

The mortgage in suit was executed in November, 1882. In December, 1883, the paper company, by its president, made a contract with the bank, which is set out in the case, by which the amount due the bank from the company on certain specified notes was adjusted at $80,409.17, and the bank agreed to lend the company that amount for at least thirty days. The contract also recognized the authority of Woodruff, as president, to bind the company in future transactions, and expressly stipulated that when the name of the company should be used by him, as president, as the maker of any promissory note, or the drawer of any draft or bill of exchange, it should be held and conclusively deemed to be for the benefit of said company and in the transaction of its business, and binding upon said company. The contract was entered into in pursuance of a resolution adopted by the entire board of trustees of the company, which then consisted of but two members, Woodruff and Mrs. Winslow, and who were also the sole stockholders. Pursuant to such contract the notes in suit were executed. The trial court found that each of said notes was discounted by the plaintiff, for the benefit of said company, and that the avails thereof were paid by it to said company upon the faith of the security afforded by said mortgage. We think the finding is supported by the evidence.

In view of the circumstances disclosed by the evidence, Woodruff, as the president of the company, and its general manager and financial agent, may be regarded as having had authority to borrow

money for the use of the company in its business, and to give the paper of the company therefor. (*Kraft* v. *Freeman Pub. Company*, 87 N. Y., 628.) Such authority may be inferred from the general manner in which for a period sufficiently long to establish a settled course of business he was allowed, without interference, to conduct the affairs of the company. (*Martin* v. *Webb*, 110 U. S. Sup. Ct. R., 7.) His authority does not rest on such inference alone. The contract of December, 1883, expressly recognized his authority and ratified his giving of notes. Furthermore, without reference to his actual authority, the notes were in form the notes of the company and within the scope of his apparent authority, and the burden of showing that they were accommodation notes, and that the bank had notice of it, is on the defendants. That burden has not been met. There is nothing in the case to show that any one of said notes was made when the money was not needed by and used for the mill. The fact that from year to year Woodruff received from the mill more than he paid out for it does not show that the notes were not made for the use of the mill. Some of the notes appear to have been for balances of account, or overdrafts, but for aught that appears those overdrafts may have arisen from the payment of money for the purposes of the mill. So that the presumption arising from the form of the paper, that it was made and used for the benefit of the company, is not overcome.

Again, if any of the notes were made for the accommodation of Woodruff, there is no evidence that the plaintiff had notice of the fact. Notice that the company was doing a profitable business, and that Woodruff was depositing a portion of its earnings, from time to time, in a common account, with his own money (and that is the extent to which notice was shown), was not even notice that he was indebted to the company, much less that the notes were made for his accommodation. Besides, the agreement of December, 1883, if binding upon the company, concludes the question of its liability on the notes then existing. And out of that agreement arose a new consideration, to wit, the surrender of the old notes and the extension of the time of payment of the debt evidenced by them, for which Woodruff was liable if the company was not, so that the transaction put it out of the power of the bank to proceed at once, even against Woodruff. There is no evidence that, as

between Woodruff and the company, the adjustment of December, 1883, was not warranted by the accounts between them, and, if there were, there is no evidence that the bank knew it. On the assumption that the agreement and the notes thereafter executed were binding upon the company, those instruments were representations by the company to the bank that the debt was its own, relying upon which the bank extended the credit, discounted the new notes and surrendered the old ones.

The appellant's counsel invokes the rule that no person can act as agent in regard to a contract to which he is a party on the side opposite to his principal, and he contends that such rule avoids the notes made by Woodruff, as the president and agent of the company, in the name of his principal, payable to his own order. The rule is for the protection of the principal, and may be waived by him. The waiver may be effected by a previous authorization of the agent, or by a subsequent adoption of his act. The case is like that of a purchase by a trustee of trust property, which, although voidable at the election of the *cestui que trust,* may be validated by his ratification. The agreement of December, 1883, executed in the name of the company, pursuant to a resolution signed by all the trustees and stockholders, was an express ratification of the act of Woodruff in making the notes described in the schedule attached thereto. The agreement provided, in terms, for the renewal of those notes, and the retention, by proper indorsement upon the paper to be given in renewal, of all claims then existing against any indorser of the notes so described. The notes in suit were made and indorsed in accordance with those stipulations, and in view of the circumstances, the company and its stockholders must be regarded as having waived the protection of the rule above referred to. But in view of that rule what foundation is there for the claim set up by the appellants, that the earnings of the mill, from time to time, became the individual property of Woodruff? There was nothing to effect or indicate a transfer of ownership in such earnings except the mere act of his charging himself with them in the books of the company. Being the agent of the company, he could not make both sides of a contract transferring the money or other property of the company to himself, unless his act in so doing was expressly authorized or adopted by the company

and its stockholders, of which we have failed to discover any proof; nor, even then, would the transfer be valid if its effect was to defraud the creditors of the company. But it is not necessary to put the decision of the point under consideration upon the ground last suggested; the reasons previously stated suffice for affirming the finding of the trial court that the notes in suit were discounted for the benefit of the company.

It is also contended by the appellants' counsel that when the notes in suit were made the company was incapable of executing them or of transacting any business, as it had but two trustees and two stockholders, to wit, Woodruff and his daughter, who assumed to act as trustees and bind the company by a resolution authorizing the agreement. This contention rests upon the provision of the act of 1848, that the affairs of every corporation formed under said act shall be managed by not less than three nor more than nine trustees, who shall be stockholders. (Sec. 3.) According to what has been said already, the president had authority to make notes in the name of the company, and for its use, without a resolution of the board. We are inclined to the opinion that he had the like authority in respect to the agreement in question, so far, at least, as such agreement recognized the authority of the president to bind the company by executing new paper of the same character as that which he had long been accustomed to make in the name of the company. But however that may be, the resolution, if not valid as an act of the board for want of the number required by the statute, was an assent by all the stockholders, and that we think was enough. A previous assent is certainly as effective as a subsequent ratification, and that a ratification by all the stockholders of the unauthorized act of the president in making the notes of the company, or agreeing to make them would cure the defect, is well settled. (*Kent* v. *Quicksilver Mining Co.*, 78 N. Y., 159; *Sheldon Hat Bl. Co.* v. *Eickmeyer Hat Bl. Co.*, 90 id, 607.) The act of the president was not *malum in se* or *malum prohibitum*. We regard the statutory provisions for the management of the affairs of the corporation by a board of trustees as intended for the protection and benefit of the stockholders, which they may dispense with by unanimous consent, and it seem quite immaterial whether they do it by previous or cotemporaneous action or by subsequent ratification.

A reduction of the board of trustees to a less number than is authorized to act by the charter, may, in certain cases, work a suspension of the franchises of a corporation until its functions are restored by legislative action, or by filling the vacancies in the board; but that rule cannot be invoked, we apprehend, to relieve the corporation from the obligations of a contract beneficial to itself, entered into in its name by the authority of its acting trustees, with the consent of all the stockholders, and the repudiation of which would operate as a fraud upon other parties.

It is contended that the mortgage and notes are void because not signed by the secretary of the company, as provided by one of its by-laws. The by-law seems to have been adopted soon after the organization of the company, but, so far as the case shows, it had never been followed, and the notes and other obligations of the company were signed by the president. The by-law does not provide that the lack of the signature of the secretary shall render the instrument void. Its design is, evidently, to prescribe the duties which the secretary may be called on to perform, but it does not prohibit the performance of the duty in question by the president or other officer to whom, by law or usage, it ordinarily pertains. We think the signature of the secretary was not essential to the validity of the instrument signed by the president in the name of the company.

The written assent of Woodruff, as a stockholder, to the giving of the mortgage, was sufficient. He was then the owner of at least two-thirds of the stock, and his assent was enough without that of the other two stockholders. (Laws 1864, chap. 517, § 2.)

Several exceptions were taken to rulings of the trial court upon the admission or rejection of evidence, to findings of the court and to refusals to find as requested. Most of them have been met in what has already been said. The only exception to which it is necessary to advert particularly is that which relates to the striking out of the evidence of Cordley respecting the state of the account between the company and Woodruff, as shown by the books. The witness was called by the defendants, and he stated that he had examined certain books of the company. He also testified to what he said was the result of his examination as to the state of the accounts. He stated on cross-examination that the books which he

examined were then in the court-house. The defendants' counsel admitted that he could produce the books, but he declined to do so. The plaintiff's counsel then moved that the evidence given from the abstract of the books be struck out on the ground that the books were not produced from which such abstract could be verified. The motion was granted and the evidence was struck out. In that there was no error. The appellants' counsel contends that it was erroneous to strike out without ordering the defendants to produce the books. Such order was unnecessary, since the defendants refused to produce the books, although they were in their possession. The refusal was not put upon the ground that no order had been made by the court, nor did the counsel propose to produce the books if ordered to do so. The refusal was peremptory and unconditional.

We think the judgment should be affirmed, with costs.

HAIGHT and BRADLEY, JJ., concurred; LEWIS, J., not sitting.

Judgment affirmed, with costs.